# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 31

### OCTOBER TERM, A.D. 2014

### February 26, 2015

ROBERT REDLAND, Individually,
ROBERT REDLAND, as Trustee of the
Robert and Irene Redland Family Trust,
Dated August 10, 1989, LISA KIMSEY
and MIKE KIMSEY,

Appellants
(Defendants),

v.

ROLLY REDLAND, KENDRICK
REDLAND, ROALENE McCARTHY
and TERESA SHELTON, Individually
and as Beneficiaries of the Robert and
Irene Redland Family Trust, Dated August
10, 1989,

Appellees
(Plaintiffs).

S-14-0159

*Appeal from the District Court of Big Horn County*
The Honorable Keith G. Kautz, Judge

*Representing Appellants:*
> Scott W. Meier, Lucas Buckley and J. Zachary Courson of Hathaway & Kunz, P.C., Cheyenne, Wyoming. Argument by Mr. Meier.

*Representing Appellees Rolly Redland, Kendrick Redland and Teresa Shelton:*
> S. Joseph Darrah of Darrah Law Office, P.C., Powell, Wyoming.

*Representing Appellee Roalene McCarthy:*
> C.M. Aron of Aron & Hennig, LLP, Laramie, Wyoming.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KITE, Justice.**

[¶1]     This is the second appeal stemming from the Redland family's dispute over ranch property that some of the Redland children claim their father, Robert Redland, agreed to place in a family trust.[1]  In the first appeal, *Redland v. Redland*, 2012 WY 148, 288 P.3d 1173 (Wyo. 2012) *(Redland I)*, this Court held that questions of fact precluded the district court's entry of summary judgment on the issues of whether the Redland Children's claims against Robert Redland were barred by the statute of frauds and the statute of limitations, and we remanded for a trial on those issues.

[¶2]     Following a bench trial on remand, the district court found that the claims were not barred, and it ordered that all of the disputed property, with the exception of the property on which Robert Redland resides ("the Manderson Place"), be immediately transferred to the family trust.  With respect to the Manderson Place, the district court ordered that the property be transferred to the trust upon Robert Redland's death.  We affirm the district court's order, with the exception of its disposition of the Manderson Place.  With respect to the latter property, we remand for entry of an order directing that the Manderson Place be immediately transferred to the family trust subject to Robert Redland's life estate in the property.

## ISSUES

[¶3]     Robert Redland states the issues on appeal as follows:

> I.      The District Court erred, as a matter of law, in holding that an enforceable agreement existed that required placing the disputed property in the Family Trust.
>
> II.     The District Court erred, as a matter of law, in determining that the Statute of Limitations did not bar [the Redland Children's] claims for the placement of property in the Family Trust.

## FACTS

---

[1] The action asserting claims to the disputed ranch property was brought by four of the five adult Redland children:  Rolly Redland, Kendrick Redland, Roalene Redland McCarthy, and Teresa Shelton. The youngest child, Lisa Kimsey, and her husband, Mike Kimsey, are aligned with Robert Redland. For ease of reference, we will, as we did in *Redland I*, refer to the four Redland children collectively as the "Redland Children," and to Robert Redland, individually, as trustee, and collectively with Lisa and Mike Kimsey, as "Robert Redland" or "Robert."

1

[¶4]   The disputed Redland property is located in three areas of the Big Horn Basin in Wyoming. Because the property at issue in the present appeal is the same property we discussed in *Redland I,* we will use the *Redland I* nomenclature to reference the property in this appeal:

### Manderson Place

The Manderson Place is located in Big Horn County. The parties variously refer to the deeded portion of this property as the Manderson Farm, the Manderson Place or the Home Place. Associated with this property is State of Wyoming Lease No. 3–8179. Also associated with the property is Bureau of Land Management (BLM) Lower Nowood Allotment No. 00144. For ease of reference, throughout this opinion, we will refer to the deeded property as the "Manderson Place," and to State Lease No. 3–8179 by number or as the "State Farm at Manderson."

### Original Mountain Land & Additional Mountain Land

The Original Mountain Land is located in Washakie and Johnson Counties. Associated with the deeded property is State of Wyoming Lease No. 3–8195, BLM Box Canyon Allotment No. 02008, and BLM Cedar Ridge Allotment No. 00145. For ease of reference, when we refer to State Lease No. 3–8195 separately, we will refer to it by number or as the "Mountain Land State Lease."

The Additional Mountain Land is located in the area of the Original Mountain Land and is deeded land that was owned by Eric Redland, Robert Redland's brother, until Eric's death in 1992.

### Woody Place

Woody Place is also located in Washakie County, south of the Mountain Land. Associated with this property is State of Wyoming Lease No. 3–8248, BLM West Allotment No. 00147, and BLM East Allotment No. 00146. For ease of reference, we will refer to State Lease No. 3–8248 by number or as the "State Lease at Woody Place."

2

*Redland I*, ¶¶ 9-12, 288 P.3d at 1178-79.[2]

[¶5]    As in *Redland I*, we believe it is helpful to an understanding of the parties' dispute to begin with a history of the parties, their property acquisitions, and their ranching operations.  Again, these facts remain unchanged since our decision in *Redland I*:

> Richard and Nellie Redland were the parents of Robert Redland and the grandparents of Robert and Irene Redland's five children: Rolly Redland, Kendrick Redland, Roalene Redland McCarthy, Teresa Redland Shelton, and Lisa Redland Kimsey. Throughout their lifetimes, Richard and Nellie Redland accumulated ranching and farming property in the Big Horn Basin, including deeded land and federal and state leases, which they hoped would be held and operated by future Redland generations. All of the property that is in dispute in this action is property originally acquired by Richard and Nellie Redland.
>
> Robert and Irene Redland were married in 1951, and began living on Manderson Place in 1953. Sometime between 1959 and 1962, they purchased the Manderson Place from Richard and Nellie Redland. Robert and Irene raised their five children on the Manderson Place, and during those years they ran sheep on the Original Mountain Land and grew crops on BLM land near Manderson.
>
> In 1971, Robert and Irene Redland purchased Woody Place from Richard and Nellie Redland. The purchase included the deeded land and an assignment of the State Lease at Woody Place. The State Lease at Woody Place is important to the Woody Place operations because the leased land is adjacent to the deeded property and holds all of the operation's water.
>
> When Robert and Irene Redland purchased Woody Place in 1971, Rolly Redland, Robert's oldest son, was attending community college in Riverton, Wyoming. Robert called on Rolly to work the new property and to manage the

---

[2] The district court's order following the trial on remand provides a clarification on two of the disputed state leases.  State Lease No. 8314, which was not separately identified in the *Redland I* property description above, is associated with the Manderson Place.  State Lease No. 8179 (a/k/a the "State Farm" or the "State Farm at Manderson") is located near the Manderson Place.

cows Robert then owned. Woody Place required substantial work, including clean-up, fencing, and irrigation work, and after making some initial improvements to the property, Rolly stayed on and has since 1971 lived and ranched at Woody Place.

Kendrick Redland began his fulltime career as a rancher in 1973. Kendrick lived on Manderson Place, and he conducted his operations primarily on Manderson Place and the Original Mountain Land. While the two Redland sons lived on separate properties, they often operated together and with their father. This included running their cattle together and supplying veterinary care, breeding and feed for the cattle.

Robert Redland's father, Richard Redland, passed away in 1971. In his will, he left to his wife, Nellie Redland, a life estate in all of his properties. To his sons, Robert and Eric Redland, he left a divided option to purchase the Original Mountain Land for $27.50 per acre, which option could not be exercised until the death of Nellie Redland. * * *

In March of 1983, Robert Redland paid Eric Redland $100,000 for his one-third option in the Original Mountain Land. As of 1983, then, Robert owned the entire option to purchase the Original Mountain Land as set forth in Richard Redland's will.

By 1989, the operations of Robert Redland and his two sons, Rolly and Kendrick Redland, had grown, with each individually continuing to increase the number of livestock they were running. Also in 1989, Nellie Redland passed away, and Robert was able to exercise the option to purchase the Original Mountain Land as described in Richard Redland, Sr.'s will. Before exercising the option, however, Robert took two steps. First, on August 8, 1989, Robert assigned part of his purchase option to his wife, Irene, and then they both made partial assignments of their interests in the purchase option to their five children, with the end result being that Robert, Irene and their five children each owned a one-seventh interest in the option to purchase the Original Mountain Land. Robert's next step was to create a family

4

trust.

On August 10, 1989, Robert and Irene Redland executed a Trust Agreement with their five children, which created the Robert and Irene Redland Family Trust ("Redland Family Trust"). Robert, Irene and the five children were beneficial owners under the trust, and Robert and Irene were the trustees. The Trust Agreement established the trust for the purpose of holding and managing property. It provided as follows concerning property acquired by the trust:

> The parties hereto declare that all property now held or hereafter acquired by the trustees or their successors, as trustees, and all income and profits therefrom, shall be by the trustees managed, administered, received, collected, disposed of, and distributed for the benefit of such persons as may from time to time be owners of beneficial interests in this trust estate, in the manner herein provided and subject to the terms and conditions set forth in this instrument and any amendments hereto.

*Redland I*, ¶¶ 13-21, 288 P.3d at 1179-1180.

[¶6]   The creation of the Redland Family Trust is at the root of the Redland family's property dispute.   The Redland Children contend they made capital and other contributions to the Trust with the understanding that certain properties historically operated on and held by members of the Redland family, including deeded properties, state leases, and federal leases, would be held by the Trust.  In February 2007, however, the Redland Children learned, from a notice in the Basin Republican Rustler, that property they understood to belong to the Redland Family Trust had been transferred from Robert and Irene Redland (through their individual revocable trusts) to Lisa Kimsey, the Redland Children's youngest sibling, and her husband, Mike Kimsey.  Rolly Redland thereafter had a title search completed, and the Redland Children learned that the Redland Family Trust did not hold the properties they understood belonged to the Trust.

[¶7]   The 2007 title search, completed in May and June of that year, revealed that the Trust presently holds the following properties:

1.      The Original & Additional Mountain Land (deeded property located in Washakie and Johnson Counties);

5

2.　　BLM Box Canyon Allotment No. 02008 (federal lease associated with Original Mountain Land);

3.　　BLM Cedar Ridge Allotment No. 00145 (federal lease associated with Original Mountain Land);

4.　　Woody Place (deeded property located in Washakie County south of the Mountain Land);

5.　　BLM East Allotment No. 00146 (federal lease associated with Woody Place); and

6.　　BLM West Allotment No. 00147 (federal lease associated with Woody Place).

[¶8]　　The following are the properties the Redland Children understood would be placed in the Redland Family Trust but which their 2007 title search showed were instead held by the Robert Redland Revocable Trust and the Irene Redland Revocable Trust (less the eleven plus acres that were deeded to Lisa and Mike Kimsey):

1.　　State Lease No. 3-8195 (state lease associated with Original Mountain Land);

2.　　State Lease No. 3-8248 (state lease associated with Woody Place);

3.　　Manderson Place (deeded property located in Big Horn County);

4.　　State Lease No. 3-8314 (state lease associated with Manderson Place);

5.　　BLM Lower Nowood Allotment No. 00144 (federal lease associated with Manderson Place); and

6.　　State Lease No. 3-8179 (state lease also known as the State Farm and located near Manderson Place).

[¶9]　　In September 2007, Irene Redland passed away, and shortly after her death, the Redland Children presented Robert Redland with a proposal to transfer all property the Redland Children originally believed was to be held by the Redland Family Trust into the Trust. *Redland I*, ¶ 36, 288 P.3d at 1182-83. Robert refused the request to transfer the property, and in 2008, the Redland Children filed the present action against Robert

6

Redland, individually and as trustee of the Redland Family Trust, and against Lisa Redland Kimsey and Mike Kimsey (collectively Robert Redland). *Id.*, ¶¶ 36, 39, 288 P.3d at 1183. The Redland Children asserted a number of claims, but particularly relevant to the present appeal was their claim for promissory estoppel. Related to that claim, the Redland Children sought an order directing that Robert Redland transfer the disputed property to the Redland Family Trust. Robert Redland answered and asserted a number of counterclaims.

[¶10] Robert Redland moved for summary judgment on the Redland Children's claims to recover the disputed trust property, asserting that those claims were barred by the statute of frauds and the statute of limitations. *Redland I*, ¶ 41, 288 P.3d at 1183-84. The litigation then progressed as follows:

> The district court granted Robert Redland's motion for summary judgment on the claims to recover real property, finding that no genuine issue of disputed fact existed and the claims were barred by the statute of limitations and the statute of frauds. * * *
>
> In that same order, the district court allowed Robert Redland to amend his counterclaims to seek declaratory relief that the Redland Family Trust violates the rule against perpetuities; to seek ejectment of Kendrick and Sharon Redland from the Manderson Place; and to seek ejectment of Rolly and Debbie Redland from the State Farm at Manderson. Robert's amended counterclaims also included claims against Rolly Redland for conversion of a sheep wagon and a tractor. In response, Kendrick, Rolly and their spouses counterclaimed for the value of the improvements that they had made to Manderson Place and the State Farm at Manderson.
>
> Shortly after the district court's entry of summary judgment, Rolly Redland filed a motion requesting that Judge W. Thomas Sullins recuse himself from the case, asserting a conflict of interest because Judge Sullins was a former partner in the law firm that represented Robert Redland, and because that same law firm drafted many of the trust documents that would be ruled on at trial. Judge Sullins denied any conflict of interest but entered an order of recusal and reassigned the case to the Honorable Keith G. Kautz.

A five-day bench trial was held before Judge Kautz beginning on August 30, 2010. On December 2, 2010, while the case was under advisement, the parties filed a stipulation resolving certain of the issues. The Redland Children dismissed their first cause of action seeking declaratory judgment that the family operated as a de facto partnership, dismissed their claim for an accounting, dismissed their request for a court implemented trust tie-breaker mechanism, and dismissed their breach of fiduciary duty claim. They reserved their right to appeal the summary judgment order against their property claims. Robert Redland agreed to not pursue efforts to have Rolly Redland removed as a trustee, and Robert reserved his causes of action for contribution of assets and an accounting in the event the Redland Children succeed in the appeal of the partial summary judgment on their property claims. Last, the parties submitted to the court a tie-breaker amendment to the Redland Family Trust and requested that the court approve the amendment in the event the court ruled that the trust is valid and not void for violating the rule against perpetuities.

On February 15, 2011, the district court issued its decision letter. The court made the following rulings:

—The court found that the Redland Family Trust does not violate the rule against perpetuities, and it approved the parties' stipulated tie-breaker amendment;

—The court found the lease agreements Robert Redland entered into with Lisa and Mike Kimsey for use of trust property were void for failure to obtain the required co-trustee approval;

—The court found that Rolly Redland owed the Redland Family Trust $6,360.00 for rent of the Woody Place for the year 2010;

—The court found no evidence that Rolly Redland had wrongfully withheld hunting fees for the Woody Place and found against Robert Redland on that claim;

—The court found that Robert Redland had not proven his claims for damages to Manderson Place or the State Farm against Rolly and Kendrick Redland and denied those claims.

8

The court further found that Rolly and Kendrick had vacated Manderson Place and the State Farm, and it concluded that Robert's ejectment action against them was thus moot;

—The court found that Kendrick Redland had proved his unjust enrichment claim for improvements to Manderson Place, and it awarded him damages in the amount of $28,737.00;

—The court found that Rolly Redland had proved his unjust enrichment claim for improvements to the State Farm at Manderson, and it awarded him damages in the amount of $14,040.00.

—In his closing argument, Robert Redland conceded that he had not proved his claim against Rolly Redland for conversion of a tractor. The court further found that Robert had not proved his claim against Rolly for conversion of a sheep wagon, and it ruled against Robert on that claim; and

—The court found that Robert Redland had not proved that he had a partnership interest in Redland Angus and denied all of Robert's claims relating to that operation.

Following entry of the district court's judgment, Robert Redland appealed the court's rulings on Rolly and Kendrick Redland's unjust enrichment claims and the court's ruling on the Redland Angus partnership claims. The Redland Children appealed the order granting partial summary judgment against their property claims.

*Redland I*, ¶¶ 41-46, 288 P.3d at 1183-85.

[¶11] The Redland Children appealed the district court's summary judgment order, and Robert Redland appealed the court's ruling awarding damages to the Redland Children on their unjust enrichment claims and its ruling against Robert Redland on his Redland Angus partnership claims. *Redland I*, ¶¶ 1-2, 288 P.3d at 1177. This Court found that disputed issues of material fact precluded summary judgment on the questions of whether the Redland Children's property claims were barred by the statute of frauds or the statute of limitations, reversed that order, and remanded for a trial on those questions. *Id.*, ¶ 181, 288 P.3d at 1214. We affirmed the district court's rulings against Robert Redland on the unjust enrichment claims and Redland Angus partnership claims. *Id.*, ¶ 182, 288 P.3d at 1214.

9

[¶12] On November 19 to 21, 2013, the district court held a bench trial on the remanded issues, and on December 26, 2013, the court issued its Judgment and Findings of Fact and Conclusions of Law. The court found that Robert Redland made repeated oral promises to the Redland Children to place the disputed property in the Redland Family Trust in exchange for the children's capital and other contributions to the Trust. The court further found, with citations to the record omitted:

> 3(b). Certain State Leases and deeded property are required by the BLM to be "base property" and are part and parcel of BLM Grazing Allotments as follows:
>
> i. Mountain and Slope deeded property and State Lease 3-8195 for Box Canyon BLM Allotment No. 02008 and Cedar Ridge BLM Allotment No. 00145;
>
> ii. Woody Ranch deeded property and State Lease 3-8248 for BLM East Allotment (No. 00146) and West Allotment (No. 00147);
>
> iii. Manderson Farm deeded property and State Lease 3-8314 for Lower Nowood BLM Allotment (No. 00144).
>
> 3(c). In order to maintain the Redland Family BLM grazing permits, prior to 1989 and after, the Redland Family has been required to enter into a management plan with the BLM which addresses grazing issues, livestock usage of resources and other matters which contemplate the usage of the deeded property and State leases tied to each BLM grazing allotment as base property. Therefore, the BLM management plan contemplates the state leases, deeded property and BLM grazing allotments to serve as one operational unit.
>
> 3(d). Rolly Redland ("Rolly"), Kendrick Redland ("Kendrick") and Robert Redland ("Robert") ran their respective cattle in common and together on what Rolly and Kendrick believed to be Trust property for many years. Included in this part of the family ranching operation were BLM leases which exclusively authorized Kendrick's, Rolly's and Robert's cattle to run on the BLM grazing allotments.
>
> * * *
>
> 47. Robert Redland refused to place the remaining property in the Family Trust when he was confronted in 2007. The following property has not been placed into the Family Trust as agreed by all parties in 1989 and 199[1]-92:

10

      a.      State Lease No. 3-8195 (on Mountain, Slope and Cottonwood);

      b.      State Lease 3-8248;

      c.      State Lease 3-8314;

      d.      Lower Nowood Allotment (BLM Number 00144);

      e.      State Lease 3-8179 (State Farm);

      f.      Manderson farm Deeded property (to be transferred upon Robert's death).

48.     Those parcels stated in the previous paragraph are integral to the Family Ranching Operation, and were intended to be placed into the Family Trust consistent with the plans clearly expressed to the Redland Children in 1989, 1991 and 1992. Without those parcels placed in the Family Trust, the plans set forth make no sense from an operational standpoint without those properties.

49.     The failure of Robert Redland to place those parcels (excluding the Manderson Farm) into the Family Trust, (sic) is a breach of his promises repeated to his Children on numerous occasions. Injustice can only be avoided if such parcels are placed immediately in the Family Trust and administered consistent with the other Family Trust assets and the historical requirements practices of the Redland Family Ranching Operation.

[¶13] The district court concluded Robert Redland's oral promises to place the disputed property in the Redland Family Trust were enforceable under the doctrine of promissory estoppel. The court further concluded the Redland Children did not know or have reason to know that Robert Redland had not placed, and refused to place, the disputed property in the Trust until 2007 and their claims were therefore not barred by the statute of limitations. Based on its findings and conclusions, the court ordered:

      a.      That [Robert Redland] shall immediately and forthwith execute any documents necessary to effectuate the full and complete assignment and transfer of State Leases 3-8195, 3-8248, 3-8314 and 3-8179 to and in favor of the Robert and Irene Redland Family Trust dated August 10, 1989;

      b.      That [Robert Redland] shall immediately and forthwith

11

execute any documents necessary to effectuate the full and complete assignment and transfer of the Lower Nowood Allotment (BLM No. 00144) to and in favor of the Robert and Irene Redland Family Trust dated August 10, 1989;

c.    The 11 plus acres transferred to Lisa and Mike Kimsey in 2007 as more fully described as T.50N, R. 91W. 6th P.M.: Section 32: SE1/4NE1/4; Sec. 33: SW1/4NW1/4 (Part) Tracts 76A, and 76B (Parts) (Ex. 139) shall be transferred back to Robert Redland, and said parcel shall be conveyed fully to the Robert and Irene Redland Family Trust dated August 10, 1989.

d.    Upon the death of Robert Redland, the property known as the Manderson Farm located within Townships 59 and 50 North, Range 91 West, 6th P.M., Big Horn County, Wyoming (as more fully described in the Owners and Encumbrances Report Title Commitment 9-6566 OE-Ex. 32) currently held by Robert Redland as Trustee of the Robert Redland Revocable Trust dated October 30, 2002 and Robert Redland as Successor Trustee of the Irene Redland Revocable Trust dated October 20, 2002 or any successor, shall be thereupon immediately transferred by deed to and in favor of the Robert and Irene Redland Family Trust dated August 10, 1989.

e.    [The Redland Children] shall be entitled to submit applications for costs.

[¶14]  On January 23, 2014, Robert Redland filed a Notice of Appeal to this Court.

## STANDARD OF REVIEW

[¶15]  "Following a bench trial, we review the trial court's findings of fact for clear error, and its conclusions of law *de novo*." *Clark v. Ryan Park Prop. & Homeowners Ass'n*, 2014 WY 169, ¶ 6, 340 P.3d 288, 289 (Wyo. 2014) (quoting *Fox v. Wheeler Elec., Inc.*, 2007 WY 171, ¶ 9, 169 P.3d 875, 878 (Wyo. 2007)).  We have further explained:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of

12

the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Miner v. Jesse & Grace, LLC*, 2014 WY 17, ¶ 17, 317 P.3d 1124, 1131 (Wyo. 2014) (quoting *Claman v. Popp*, 2012 WY 92, ¶ 22, 279 P.3d 1003, 1012 (Wyo. 2012)).

[¶16] In considering the evidence on review, "we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it." *Miner*, ¶ 17, 317 P.3d at 1131 (quoting *Claman*, ¶ 22, 279 P.3d at 1012).

[¶17] Finally, we note that this Court may affirm a district court's ruling on any basis appearing in the record. *Magin v. Solitude Homeowner's Inc.*, 2011 WY 102, ¶ 20, 255 P.3d 920, 927 (Wyo. 2011); *Olsen v. Kilpatrick*, 2007 WY 103, ¶ 10, 161 P.3d 504, 507 (Wyo. 2007); *Walker v. Karpan*, 726 P.2d 82, 89 (Wyo. 1986) ("This court will affirm rulings of the district court for any proper reason appearing of record, even if the articulated reasons are incorrect.").

## DISCUSSION

[¶18] On remand, the district court held a bench trial on two questions: 1) whether Robert Redland made enforceable promises to place the disputed trust property in the Redland Family Trust; and 2) whether the statute of limitations barred the Redland Children's action to enforce those promises. As noted above, the district court found that Robert Redland did promise to place the disputed properties in the Trust, those promises were enforceable, and the statute of limitations did not bar the Redland Children's action to enforce the promises.

[¶19] With regard to the district court's finding of enforceable oral promises, Robert Redland does not challenge the court's findings of fact but instead contends that the court erred as a matter of law in enforcing any promise not expressly contained in the written Trust Agreement. With regard to the court's ruling on the statute of limitations, Robert argues both that the court erred a matter of law and that the court erred in failing to give weight to evidence that Robert contends showed the Redland Children knew or should have known of their cause of action years earlier.

13

## A. Enforceability of Oral Promises Regarding Disputed Trust Property

[¶20] As we noted above, Robert Redland does not challenge the district court's basic findings of fact or the evidentiary support for its findings that Robert made enforceable promises to place the disputed property in the Redland Family Trust. Instead, he argues the court erred in considering parol evidence and in looking outside the Trust Agreement to find those promises. More specifically, Robert asserts "the District Court held that only one agreement existed and it was in writing," that agreement was the written Trust Agreement, and there is no ambiguity in that written agreement. From this, he argues that because the court found no ambiguity in the Trust Agreement, it was error for the court to admit parol evidence and the court improperly used that evidence to read additional terms into the agreement. He further argues that it was improper for the court to consider evidence outside the Trust Agreement because the Trust Agreement was the entirety of the parties' agreement and if the parties had intended that other property be placed in the Trust, that understanding would have been reflected in the written Trust Agreement.

[¶21] At the outset, we disagree with Robert Redland's assertion that the district court found that the only agreement between the parties was the written Trust Agreement. This statement in Robert Redland's brief is not supported by a cite to a particular finding in the district court's order, and on our review of the order, we find no such finding. While we agree that the court identified only one written agreement, the Trust Agreement, and cited no ambiguity in that agreement, the court's final ruling was based on oral promises and agreements to place property in the Trust, which promises and agreements the court found outside the Trust Agreement. We thus reject Robert Redland's first assertion and turn to his arguments that the court: 1) improperly used parol evidence to create additional Trust Agreement terms; and 2) erred in considering evidence of oral promises outside the written Trust Agreement.

### 1. Use of Parol Evidence to Create Additional Trust Agreement Terms

[¶22] This Court has defined the parol evidence rule and described its parameters as follows:

> The district court's decision letter seems to suggest, by considering extrinsic evidence of the "surrounding circumstances" of a deed's execution, we endorse a violation of the parol evidence rule. Those statements indicate a misunderstanding of the parol evidence rule, which is a rule of substantive law rather than a rule of evidence. *See, e.g., Bowen v. Korell*, 587 P.2d 653, 656 (Wyo.1978). It originated in the doctrine of merger, which states: "[A]ll provisions in a contract are merged into the deed when executed and

14

delivered except those covenants which are deemed to be collateral to the sale. Thus, the deed regulates the rights and liabilities of the parties." *Bakken v. Price*, 613 P.2d 1222, 1227 (Wyo.1980), quoting 8A *Thompson on Real Property*, § 4458, p. 331. *See also Bixler v. Oro Management, L.L.C.*, 2004 WY 29, ¶ 13, 86 P.3d 843, 848 (Wyo.2004).

> "The parol evidence rule has been stated in many ways but the basic notion is that a writing intended by the parties to be a final embodiment of their agreement may not be contradicted by certain kinds of evidence. A writing that is final is at least a partial integration. If the writing is final and also complete, it is a total integration and may not only not be contradicted by the type of evidence in question but may not even be supplemented by consistent (non-contradictory) additional terms. If it is final and incomplete it may be supplemented by consistent additional terms."

*Longtree, Ltd. v. Resource Control International, Inc.*, 755 P.2d 195, 204 (Wyo.1988), quoting, J. Calamari and J. Perillo, *Law of Contracts*, § 3–2 at 135–36 (3d ed.1987). Consequently, the function of the parol evidence rule is to prevent parties from supplementing or contradicting the terms of the contract. *See* Restatement (Second) of Contracts § 231; E. Allan Farnsworth, *Contracts*, §§ 7.2 through 7.7 (3d ed.1999). Once the terms of the agreement are identified, the parol evidence rule ceases to operate. The rule does not prohibit use of extrinsic evidence of the circumstances surrounding the execution of the deed to interpret the meaning of its terms. *Id*. By allowing evidence of the circumstances surrounding execution of the deed, courts are more apt to arrive at the parties' true intention at the time of the execution of the deed.

*Mullinix, LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 25, 126 P.3d 909, 920 (Wyo. 2006).

[¶23] In arguing that the district court improperly used parol evidence to create additional Trust Agreement terms, Robert Redland points to the district court's rationale for considering parol evidence as stated in its conclusions of law:

15

4.   In construing the 1989 Family Trust, the Court concludes that the testimony of all six Redland family members is proper parol evidence with regard to the understandings among them in forming the Trust, as follows:

    a.   to explain the terms of the Trust Agreement;

    b.   to explain the reasons for the agreement and what the parties intended as to the total property to be included in the Trust;

    c.   to explain the Trust Agreement provisions concerning property the parties intended to be included in the Trust.

[¶24]  Although paragraphs 4(a) and 4(c) do not frame the district court's use of parol evidence as clearly as they might have, and we understand they may be read to suggest that the court used parol evidence to define the property contemplated by the Trust Agreement's terms, the court's order does not reflect that it used parol evidence in that manner.  The only finding of fact in the court's order that references a Trust Agreement provision and testimony related to that provision is Paragraph 11(m) of the findings of fact in which the court found:

> Prior to the signing of the Trust Agreement, Rolly referred to the paragraph in the proposed Trust Agreement containing language which stated: "all property now held or hereafter acquired by the trustees or their successors" to seek clarification as to exactly what property the Trust would eventually own and hold.  To that, Robert responded that the provision required all of the property then owned by Robert and Irene Redland as well as the property held by the Estate of Richard Redland and any other property Robert acquired to be placed into the Family Trust.

[¶25]  Although the district court included this finding in its order, the court did not in its conclusions of law cite the finding or otherwise draw on it to interpret or define the referenced Trust Agreement provision.  Indeed, the order contains no findings or conclusions that show a use of parol evidence to define or supplement a particular term in the Trust Agreement.  It is apparent from a review of the court's order, that in finding enforceable agreements to place the disputed property in the Trust, the court was not using extrinsic evidence to find those promises or agreements in the Trust Agreement itself but was instead considering the enforceability of promises or agreements outside

16

the Trust Agreement.  We thus reject Robert Redland's argument that the court used parol evidence to add terms to the unambiguous Trust Agreement and turn to his argument that the court violated the parol evidence rule by looking outside the Trust Agreement for agreements or promises.

## 2. Oral Agreements Outside the Trust Agreement

[¶26]  Robert Redland contends that because the Trust Agreement was unambiguous and represented the entirety of the parties' agreement, the district court erred when it considered evidence of agreements outside the Trust Agreement.  Based on this Court's precedent, we find no violation of the parol evidence rule in the court's reliance on evidence of oral agreements outside the Trust Agreement.

[¶27]  Although parol evidence may not be used to contradict an unambiguous written agreement, this Court has recognized that evidence outside that written agreement may be used to establish oral agreements that are separate and distinct from the written agreement.  We have explained:

> [W]e depart from the parol evidence rule if the evidence is used to establish a separate and distinct contract, a condition precedent, fraud, mistake, or repudiation. *Applied Genetics v. First Affiliated Securities*, 912 F.2d 1238, 1245 (10th Cir.1990); *Western Nat'l Bank of Lovell v. Moncur*, 624 P.2d 765, 770–71 (Wyo.1981). Evidence of an oral agreement is considered if the oral agreement does not vary the terms of the writing, or if it is "separate and distinct from, and independent of, the written instrument." *Applied Genetics*, 912 F.2d at 1246 (quoting *Moncur*, 624 P.2d at 771 and citing *Allen v. Allen*, 550 P.2d 1137, 1141 (Wyo.1976) and *Cordova v. Gosar*, 719 P.2d 625, 640–42 (Wyo.1986)). In other words, the parol evidence rule "does not affect a purely collateral contract distinct from, and independent of, the written agreement, even though it relates to the same general subject matter and grows out of the same transaction, if it is not inconsistent with the writing." *Moncur*, 624 P.2d at 770–71.

*Belden v. Thorkildsen*, 2007 WY 68, ¶ 16, 156 P.3d 320, 324-25 (Wyo. 2007).

[¶28]  In an earlier case, this Court explained the exception to the parol evidence rule for collateral oral agreements, stating:

17

It is unnecessary to analyze and delineate each of these cases or to discuss the matter at any great length since the encyclopedic statement of the rule clearly provides for 'certain exceptions' which are apparent on the face when it is further stated that the rule is applicable only where the parties have without uncertainty put into writing all previous or contemporaneous negotiations and agreements with reference to the subject matter. As plaintiff points out, the same encyclopedic reference at s 997, p. 509, states that the rule excluding parol evidence to vary or contradict a writing does not extend so far as to preclude the admission of extrinsic evidence to show a valid prior or contemporaneous collateral parol agreement between the parties, which is separate and distinct from, and independent of, the written instrument, has not been merged in, or superseded by, such instrument, and does not contradict, conflict with, or vary the express or implied provisions thereof or deal with a definite and particular subject matter which the written instrument expressly or impliedly undertakes to cover. In the *Cary* case, 287 P. at 436, this court noted that exceptions to the parol evidence rule generally arise as a circumvention to fraud in some form, either as to the execution or as to the delivery of the instrument, where the written contract is incomplete upon its face or ambiguous in its terms, or the oral agreement is independent and collateral and rests upon its own mutual considerations.

*Lefforge v. Rogers*, 419 P.2d 625, 627 (Wyo. 1966).

[¶29]  To determine whether an oral agreement is truly separate from a written agreement and not simply a term that was omitted from the writing, another authority offers the following test:

A distinction—logically and theoretically conceivable—must, therefore, be attempted between promises that are intended to be or are inherently and substantially collateral to the main purpose of the contract and those which, although allegedly part of a separate agreement, directly relate to the main object of the contract. However, to differentiate the promises in contracts as either collateral or included is very difficult and sometimes nearly impossible; and, however the matter is phrased, it is likely that the basis for the courts admitting or

18

excluding proof of additional oral terms to an apparently complete written contract is practical rather than theoretical. The test of admissibility is substantially affected by the likelihood, in the court's view, that parties who contract under the circumstances in question would simultaneously make both the agreement in writing which is before the court as well as the alleged parol agreement. The point is not simply whether the court is convinced that the parties before it did or did not in fact do this—although that certainly plays a role in the decisions—but whether reasonable parties situated as these parties were would naturally or obviously or normally do so. If that is true, the parol agreement is collateral to and separate from the writing so as to make it admissible. The vast majority of courts assessing the admissibility of parol evidence at common law apply this test. This test is commonly known by the adverbs used by the courts which apply it, and might be variously called the "naturally" test, the "naturally and normally" test, the "ordinarily" test, or any of a host of words used by the courts to indicate that parties similarly situated might reasonably have believed it appropriate to keep the two agreements separate. Moreover, the test can be stated in the affirmative or the negative: either way the key question is the same. Thus, one way to ask the question is whether the nature of the collateral agreement was such that, if the parties had agreed to it, they would naturally have included it in their writing. Asked in this way, if the answer is that they would have, and they did not, they engaged in "unnatural" behavior, and evidence of the alleged agreement is inadmissible. The same question might be asked in another way: whether the nature of the collateral agreement was such that, if the parties had agreed to it, they would naturally have made it the subject of a separate agreement. Here, if the answer is that they would have, evidence as to it is admissible, for they have done the "natural" thing by keeping it the subject of an agreement separate from the main contract.

11 Williston on Contracts § 33:28 (4th ed.) (Updated May 2014) (footnotes omitted).

[¶30] While the district court's order does not expressly identify the considerations outlined above, we are persuaded by our review of the court's order that its finding of enforceable oral agreements outside the Trust Agreement is consistent with this analysis.

19

In its findings and conclusions, the court considered both the Trust Agreement and the evidence of oral agreements not in an effort to define or supplement the Trust Agreement itself but to guide the court in determining whether the Trust Agreement represented the parties' entire agreement or whether there were enforceable oral promises or agreements outside the Trust Agreement. In doing so, the court was mindful of the need to disregard extrinsic evidence that conflicted with the Trust Agreement, stating in its conclusions of law:

> 6. The testimony of Rolly, Roalene, Teresa and Kendrick concerning the property to be included in the Trust is consistent with, and does not contradict, the express written terms of the Trust Agreement. *Restatement First, Contracts*, §§ 237-239; *Guarantee Trust Co. of N.Y. v. Williamsport Wire Rope Co.*, 222 F.2d 416 (3d Cir. 1955).

[¶31] The court's rulings on the admissibility of the extrinsic evidence during Rolly Redland's testimony at trial confirm the court's approach in considering the extrinsic evidence:

> [Counsel for Robert Redland]: * * * [W]e're asking the court to read the trust agreement, which is a contract, and determine if there's any ambiguity at all in the terms of this contract. Now, anything beyond that might be some oral promises that we also know they're going to talk about, but the oral promises are separate and distinct from a written document. This trust agreement is clear on its face. It says exactly what property is going to go into it. It also says in paragraph 10, the parties may add other property to it. May. Not shall. May add other property to it.
>
> It also says, this language that was brought up, "now held or hereafter acquired by the trustees," is in representative capacity as trustees. It doesn't say, "as husband and wife," or "as individuals" or anything else. It says acquired now or [hereafter] by the trustees. So we think it's very clear on its face and while they may want to talk about some circumstances surrounding this thing, they gave their money, they got their interest and the trust was formed owning the mountain property. We submit that going beyond that just devolves down to a he-said/she-said discussion from now, forward, and it's not necessary in this context of this particular trust agreement. We think that the court can

20

construe it and find it's clear and unambiguous and it means what it says.

THE COURT: Thank you.

The court finds that there's not a suggestion that this testimony will conflict with the terms of the trust so that doesn't constitute parol evidence. The court also finds that there are issues in this case relating to whether or not there was an agreement underlying the formation of the trust and whether the way this trust was formed constitutes a fulfillment of that agreement and so it is acceptable for this witness to testify as to his understanding of the agreement, so I will overrule the objection.

[¶32] The question we must answer then is whether the district court erred in implicitly concluding the Trust Agreement did not represent the parties' entire agreement and the extrinsic evidence showed separate enforceable oral agreements. Summarizing the authorities cited above, our determination requires consideration of the following factors:

a. Whether it was natural and normal for the parties to leave the subject matter of their oral agreements out of the written agreement (the "natural and normal test);

b. Whether the oral agreements conflict with the written agreement; and

c. Whether the oral agreements are supported by their own mutual consideration.

[¶33] In addressing each of these factors, we note again that while Robert Redland challenges the district court's reliance on extrinsic evidence and its conclusion that enforceable agreements existed outside the Trust Agreement, he has not disputed the court's basic findings of fact or the evidentiary support for those findings.

### a. Natural and Normal Test

[¶34] There are a number of circumstances in this case that explain why the Trust Agreement did not identify all of the properties the Redland Children claim the parties agreed would eventually be placed in the Redland Family Trust. First, as the district court expressed in paragraph 29 of its findings, one of the reasons for creating the property-holding Trust was to avoid adverse tax consequences: "The Family Trust was created to preserve Redland Family Real Estate as an estate planning tool which would not create estate taxation issues, but would preserve the operation." Rolly Redland testified to his understanding of this issue based on conversations with Robert Redland:

Q. Okay. Did anyone tell you that this gifting needed to be divided between years or do you know why it was set up that way?

A. Well, his explanation was, is everything has to go in in layers. It can't all go at one time. It's got to go in layers. And part of it is how it came about to begin with, but it had to be layered up to go in.

[¶35] An additional reason not all of the disputed property was identified in the Trust Agreement and immediately placed in the Trust is that at least some of the property was not owned by Robert Redland or the Redland Children or even subject to specific identification when the Trust Agreement was executed in 1989. In particular, the lands eventually purchased from Eric Redland's estate were not available in 1989 and it was not known in 1989 which of his properties, if any, would eventually be available for purchase. The court's order captures this circumstance in the following findings:

11(b). [Prior to the signing of the Trust Agreement], Robert stated to his children that he was aware that Uncle Eric Redland's property would eventually become available to purchase, and that the Family needed to be ready to purchase that property. The Redland family members were aware that Eric Redland was in financial straits, as they were leasing the State Farm from him during and prior to August, 1989.
* * *
15. Uncle Eric (Pooch) Redland died unexpectedly in October, 1991, so Robert again approached his children about additional property for the Family Trust consistent with the plan he expressed to his children in August, 1989. * * *
* * *
21. Robert then met with Rolly after he met with Eric's children about settling Uncle Eric's Estate. As it pertains to Eric's children, Robert explained to Rolly that Mark Redland takes Eric's home place, Matt Redland takes the School Section and cousin Kari is going to take money. Robert then stated that when it is all said and done, the Family Trust will have the Mountain property and the State Farm (State Lease #3-8179).

[¶36] The final circumstance that explains why not all of the trust property was identified in the Trust Agreement relates to the Manderson Place. The district court found: "Robert did state that he wanted a place for 'Mother' to live on, so that the last

22

piece of property to go into the Family Trust would be the Manderson Farm." Kendrick Redland explained the agreement regarding the Manderson Place in his testimony:

> Q.     Okay.   So what other discussions were had during this meeting, that you can recall?
> A.     That was basically it.   I mean, we just kept going over that to make sure that we knew what we were investing in over time.   The other part, Mom and Dad, they were putting a lot on the line, too.   So the discussion was the last thing to go in would be the Home Farm, that Manderson Farm.   That would be the very last thing to go in.
>
> * * *
>
> Q.     [Counsel for Robert Redland] suggested that there was something in there about the arrangement that you're now seeking as not being fair to your parents.   My question for you is whether there was consideration of taking care of your parents when you formed that trust?
> A.     That was a large part of our discussion.   Mom and Dad, they're putting a lot into this deal, too.   They really were.   And that was one of Dad's concerns is that they'd be taken care of.   We, wholeheartedly, agreed that they needed to be taken care of.   Part of that agreement was that they had use of their Home Farm until as long as they lived.   That was theirs, on that, to maintain them.   We have never made any sort of accusations any other way on that.
> Q.     So the understanding was that regardless of whether it's in the trust or not in the trust, they were still to stay on that property?
> A.     Absolutely.

[¶37]  Given these circumstances, we find that it was neither unnatural nor abnormal that the parties omitted their separate oral property agreements from the written Trust Agreement.

### b.     Conflicts with Trust Agreement

[¶38]  Our next consideration is whether the separate oral agreements conflict with the Trust Agreement.

[¶39]  The Trust Agreement identifies the initial property to be placed in the trust, but it does not limit the property the Trust may hold to that initially identified.   The Trust

Agreement in fact specifically provides, in Section Ten, for the addition of property to the Trust:

> The Parties hereto and any other beneficial owner of the trust estate may at anytime add other property acceptable to the trustee to the trust estate by conveyance, assignment, will or any other mode of transfer. Such property when received and accepted by the trustee shall become part of the trust estate and shall be subject to all the terms and conditions of this trust instrument.

[¶40]  Given that the separate oral agreements were for property to be placed in the Trust and the Trust Agreement allows for the addition of property, we find no conflict between the agreements.

### c.       *Mutual Consideration for Separate Oral Agreements*

[¶41]  The final question is whether the separate oral agreements were supported by consideration.   We conclude that they were.

[¶42]  Richard Redland, Sr.'s widow, Nellie Redland, passed away in 1989, which allowed for the exercise of the purchase option bequeathed by Richard Redland, Sr.'s will.  The Trust Agreement was executed shortly thereafter, and the initial consideration the parties contributed was $27,500 each, which, as the court found, was the amount required to exercise the purchase option.

> Robert Redland made it very clear that he needed money from each of the Redland children to be able to purchase the Mountain and Slope Property and repeated that all of the Mountain property and other property from [the] Richard Redland Estate was going to go into trust if they invested the $27,500.00.

[¶43]  Our inquiry then is whether there was separate consideration for the disputed property that is the subject of the oral agreements.  We find that there was consideration for the disputed property, separate from the $27,500 contributed for the exercise of the Richard Redland, Sr. purchase option.  In this regard, there is some consideration that relates to all of the disputed property and other consideration that is specific to individual properties.

[¶44]  Beginning with the more generalized consideration that relates to all of the property to be placed in the Trust, the district court made findings that the Redland

24

Children, and in particular Rolly and Kendrick Redland and their families, devoted their lives to the Redland family operations based on their belief that they were operating on and contributing to lands that were or would be Trust lands. On a similar note, Rolly Redland annually negotiated a private grazing lease, known as the Lungren lease, which was an important contribution to the family operations on the Woody Place because "it was adjacent to and intervened between the West Allotment, Redland deeded ground and State Lease No. 3-8248." The court further found that Rolly Redland contributed to the operations by managing Woody Place and any of Robert's and Kendrick's cattle that ran there each year. Finally, the court found that "Rolly and Kendrick either turned any dividends back which were paid out of the Family Trust, or never cashed the dividend checks," believing they were operating on and contributing to Redland Family Trust lands.

[¶45] As to the consideration more specific to individual properties, the district court found:

**State Lease No. 3-8179 (State Farm):**

[¶46] The State Farm was one of the two properties purchased from Eric Redland's estate. The other property was the deeded property known as the Additional Mountain Property, and it is already in the Trust. The district court found that in 1991-1992 Robert Redland received $13,000 from each of his three daughters, $40,000 from Kendrick Redland, and $60,000 from Rolly Redland to purchase both properties from Eric Redland's estate to be placed in the Trust. The order authorizing the sale of these properties shows that Robert Redland paid $88,370 for the deeded property and $37,200 for the State Farm. The record is thus clear that there was separate monetary consideration paid by the Redland Children for placement of the State Farm in the Trust.

[¶47] In addition to the separate monetary consideration specific to the State Farm, the Redland Children also made improvements to and contributed to operations on the State Farm. The court found in Paragraph 39 of its findings, with transcript citations omitted:

> a.    * * * Kendrick had spent considerable time and expense on the State Farm buying and planting seed, haying, developing irrigation structures, and building fence to name a few. Sharon herself would often time provide labor for the haying. When Sharon had to go away for cancer treatment for an extended period of time, Kendrick hired Sharon's father to perform the irrigating on the State Farm.
> * * *
> j.    * * * Rolly paid $4,000.00 dollars to improve the road on the State place so that water would drain out.

25

k.      Rolly also constructed a calving shed on the State place in 2005 or 2006.  Both Rolly and Robert had been calving on the State place, so the calving shed was to benefit both of them.  * * * Rolly paid for everything but a few posts.  Rolly also hooked up water to the building and wired the building. * * *

**Manderson Place:**

[¶48] Kendrick and Sharon Redland made improvements to the Manderson Place believing it to be Trust property.  Those improvements were discussed in *Redland I*, and we will not repeat the details of those improvements here.  *See Redland I*, ¶¶ 139-141, 288 P.3d at 1204.  In the district court's order following the first trial, the court valued the improvements at $28,737, and we affirmed that valuation.  *Redland I*, ¶ 159, 288 P.3d at 1209.

[¶49]  Based on the Redland Children's contributions of capital, labor, and improvements to acquire, maintain, and operate the disputed properties, we have no difficulty finding that separate consideration was provided for the oral agreements to place those properties in the Redland Family Trust.  Having found that the separate oral agreements were naturally and normally omitted from the written Trust Agreement, the agreements do not conflict with the Trust Agreement, and the agreements were supported by separate consideration, we conclude  the district court did not err in finding and relying on oral agreements outside the written Trust Agreement to reach its promissory estoppel ruling. *See Verschoor v. Mountain West Farm Bureau Mut. Ins. Co.*, 907 P.2d 1293, 1298 (Wyo. 1995) (holding that insurer's oral promise to cover cost of surgery could not be used to alter terms of written insurance policy but may be basis to find separate enforceable promise under doctrine of promissory estoppel).

[¶50] As we noted earlier in this opinion, Robert Redland has not challenged the findings underlying the district court's application of the doctrine of promissory estoppel, but has instead confined his argument to that which we just discussed—that promissory estoppel should not be invoked because there was no basis for the court to look outside the four corners of the written Trust Agreement.  Having addressed Robert's argument above, this Court need not and will not further examine the district court's promissory estoppel findings and the evidentiary support for those findings.

**B.      Statute of Limitations**

[¶51]  We address next Robert Redland's contention that the district court erred in not finding the Redland Children's claims barred by the statute of limitations.  Robert argues

the court erred both in determining when the Redland Children's claims accrued and in applying the discovery rule to determine when the statute of limitations was triggered. Because we find that this issue is resolved by consideration of the court's application of the discovery rule, we begin our analysis there.

[¶52] "Wyoming is a discovery jurisdiction, which means that a statute of limitation is triggered when a plaintiff knows or has reason to know of the existence of a cause of action." *Redland I*, ¶ 54, 288 P.3d at 1186 (citing *Carnahan v. Lewis*, 2012 WY 45, ¶ 27, 273 P.3d 1065, 1073 (Wyo. 2012)). As we explained in *Redland I*:

> That is, the statute begins to run when the claimant is chargeable with information which should lead him to believe he has a claim. If the material facts are in dispute, the application of a statute of limitations is a mixed question of law and fact; otherwise, it is a question of law.

*Redland I*, ¶ 54, 288 P.3d at 1187 (quoting *Carnahan*, ¶ 27, 273 P.3d at 1073).

[¶53] Applying the discovery rule, the district court ruled that the Redland Children's 2008 complaint was not barred by the statute of limitations. The court based its ruling on the following findings and conclusions, citations to the record omitted:

> 40.    There is no indication that [the Redland Children] were aware that Robert had failed to live up to his promises until Sharon Redland saw a land transfer to Lisa and Mike Kimsey in the February 22, 2007 Basin Republican Rustler. This caused Rolly Redland to wonder why land that was supposed to go into the Family Trust was being transferred to his sister Lisa when Kendrick and Rolly's homes were not owned by them.
>
> 41.    Rolly called Lisa about this. Rolly then became very suspicious and requested that Ken Baumeister perform an Ownership and Encumbrance Report on all property thought to be held in the Family Trust. Baumeister did perform the title search which revealed that the State Leases had not been placed in Trust like Rolly thought they had. Rolly went to see Robert less than 48 hours after receiving the title information from Baumeister in order to confront him and requested that Robert put all of that land into the Trust. Robert indicated he would never do so.
>
> * * *

27

22. [The Redland Children's] first knowledge of Robert's failure to convey property into the Family Trust occurred in 2007 when Rolly Redland learned that ranch property he thought was supposed to be transferred later into the Family Trust had been given or sold to his sister, Defendant Lisa Redland Kimsey.

23. Upon discovery that property he thought was in the trust had been sold, Rolly ordered a title search to confirm what property was in the Trust.

24. [Robert Redland] offered no evidence of any date before 2007 when [the Redland Children] were chargeable with information which should have led them to believe they had a claim, or when a demand had been made by Roalene, Rolly, Kendrick or Teresa for Robert to convey the omitted ranch property, and that Robert had refused to do so.

[¶54] Robert Redland argues the district court erred in its application of the discovery rule by ignoring evidence that showed the Redland Children knew or should have known much earlier that the disputed property was not in the Trust. He further argues the court should not have applied the discovery rule at all because it is inapplicable to the triggering of the statute of limitations in a contract action.

[¶55] If we were to accept Robert Redland's latter argument, that the discovery rule is inapplicable to the statute of limitations analysis in this case, then no further analysis of the discovery findings would be necessary. We therefore start with the argument that the discovery rule does not apply at all in breach of contract actions. For this proposition, Robert cites to this Court's decision in *Richardson Assoc. v. Lincoln-Devore, Inc.*, 806 P.2d 790 (Wyo. 1991), wherein the Court stated:

> This court is faced with the further contention that a discovery factor should be applied to the contractual limitation statute, W.S. 1–3–105(a), to provide tolling of the statute until discovery which would provide a defense to the contractual statute of limitations. As a constituent of a statute of limitations application, discovery is generally a tort concept. *Mills v. Garlow*, 768 P.2d 554 (Wyo.1989); *Anderson v. Bauer*, 681 P.2d 1316 (Wyo.1984); *ABC Builders, Inc. v. Phillips*, 632 P.2d 925 (Wyo.1981). See, for example, *Young v. Young*, 709 P.2d 1254 (Wyo.1985); W.S. 1–3–106, conversion and fraud premised on discovery; and

28

W.S. 1–3–107, professional care two-year statute of limitations. *Metzger v. Kalke*, 709 P.2d 414 (Wyo.1985). Conversely, it is clear that the improvement to real property statute, W.S. 1–3–111, was intended to apply without regard for discovery in application of its ten year period. The principle applied to contractual actions is that the statute of limitations commences to run when the right or cause of action accrues, *Bliler v. Boswell, Administration*, 9 Wyo. 57, 59 P. 798 (1899); *Roberts*, 304 A.2d 364, which in this case is when the work was done and the report filed. *Sears, Roebuck & Co. v. Enco Associates, Inc.*, 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (1977); *North Carolina States Ports Authority v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 240 S.E.2d 345 (1978). This is usually the time of a breach of a contractual agreement rather than the time that actual damages are sustained as a consequence of the breach. *John J. Kassner & Co., Inc. v. City of New York*, 46 N.Y.2d 544, 415 N.Y.S.2d 785, 389 N.E.2d 99 (1979); 51 Am.Jur.2d, *supra*, § 126.

*Id.* at 801-02.

[¶56] We reject Robert Redland's argument for a couple of reasons. First, this is the second time this matter has been before this Court, following two bench trials, and we are unable to find in the record that this argument was at any time made to the district court, or to this Court in the prior appeal where we first addressed the statute of limitations question. We have repeatedly held that we will not consider issues raised for the first time on appeal, *Miller v. Beyer*, 2014 WY 84, ¶ 34, 329 P.3d 956, 967 (Wyo. 2014), and this argument highlights one of the reasons for our reluctance. Omitted from the *Richardson* quote above was the Court's statement immediately following the quoted paragraph wherein the Court cautioned:

> We do not now determine that discovery can never become a requirement for commencement of statute of limitations in contractual actions; for example, when fraud or intentional concealment is alleged. *Olson v. A.H. Robins Co., Inc.*, 696 P.2d 1294, 1299 (Wyo.1985). However, this case provides no allegation or evidence by Architect and Mechanical Engineer upon which the district court was faced with factual review of an explanation which would foreclose contract work completion to trigger the statute of limitations commencement. Within this record, neither the district court

29

nor this tribunal are favored with the soil test report, any evidence of the oral contract upon which it was prepared, a copy of the construction contract, a copy of Architect's contract, or Mechanical Engineer's contract with Architect. We are provided no specific details whether either Architect or Mechanical Engineer ever had contact with Soil Lab, except whatever non-defined use of the June 9, 1977 report they made.

*Richardson*, 806 P.2d at 802 (footnote omitted).

[¶57] This Court did not in *Richardson* announce a blanket rule that the discovery rule never applies to contract actions, and the context provided above makes it clear that it depends on the facts and circumstances of any particular case. In this case, because the district court was not given an opportunity to consider the argument there are no findings on the question, and we do not have a proper record on which to explore the considerations that may or may not warrant application of the discovery rule to a contract action.

[¶58] The second and perhaps more fundamental reason that we reject this argument is that the Redland Children's claim on which the court granted relief was a promissory estoppel claim, not a breach of contract claim. *See Frost Constr. Co. v. Lobo, Inc.*, 951 P.2d 390, 397 (Wyo. 1998) ("Recovery under the promissory estoppel theory is not a matter of contract but, instead, is predicated on the promisee's change in position, to his detriment, as a consequence of the promise made.") In his argument, Robert Redland did not show how the comments in *Richardson* extend to a claim based on promissory estoppel, and such an extension would be contrary to this Court's past application of the discovery rule. In *Davis v. Davis*, 855 P.2d 342, 350 (Wyo. 1993), this Court reviewed a statute of limitations finding on a claim for recovery of property premised on theories of promissory estoppel and partial performance. We stated:

KWD contends that the statute of limitations did not begin to run until he knew of or had reason to know of the existence of a cause of action, relying upon *Mills v. Garlow*, 768 P.2d 554 (Wyo.1989), for this position. We recognize this rule of law, but KWD's argument that he had no cause of action until 1991 is not supported by the record.

*Davis*, 855 P.2d at 350.

[¶59] We turn then to Robert Redland's contention that the district court erred in its application of the discovery rule because it did not give proper weight to evidence that

30

Robert contends should have caused the Redland Children to question the property holdings at a much earlier date. In making this argument, Robert again does not challenge the district court's findings of facts or the evidentiary support for those findings.[3]

[¶60] Without disputing the district court's findings, Robert argues that the following facts show that the Redland Children knew or should have known the disputed properties were not in the Trust and were not going to be placed in the Trust much earlier than 2007:

1) The disputed properties were not identified on Exhibit A to the Trust Agreement;

2) When the properties that are in the Trust were transferred to the Trust, the Redland Children executed documents related to those transfers. That no documents were executed related to the disputed properties should have alerted the Redland Children that the properties were not considered Trust properties;

3) Woody Place and its related state and federal leases were owned by Robert Redland when the Trust was formed and Robert did not begin the steps to transfer the Woody Place properties to the Trust until 1992, well after the Trust's formation; and

4) Given that the Redland Children, and in particular Rolly Redland and Kendrick Redland, placed so much stock in the Trust and so much reliance on the Trust, they should have a corollary obligation to exercise diligence in protecting their interests.

[¶61] We find no clear error in the district court not citing these facts as information that should have placed the Redland Children on notice of Robert Redland's breach. First, as discussed earlier, the court found that one of the reasons the Trust was created was for estate planning purposes and to avoid adverse tax consequences related to transfers of the family property, and based on those considerations, the Redland Children understood that all of the Trust property may not be placed in the Trust at one time. As Rolly Redland

---

[3] While Robert does not challenge the district court's findings of fact or the evidentiary support for those findings, he does suggest that there was an unfairness in what he terms the court's "unscrutinized adoption" of the Redland Children's proposed findings and conclusions. While the record does reflect that the court largely accepted the Redland Children's proposed findings and conclusions, the record also reflects that the court independently reviewed the findings and conclusions before issuing its own ruling. For example, Paragraph 31 of the Redland Children's proposed findings adopts the conclusions of the Redland Children's expert economist, whereas Paragraph 31 of the court's findings rejects that economist's conclusions.

testified, he was told the property needed to be placed in the Trust "in layers." Given this circumstance, the fact that all of the property was not placed in the Trust in a single transaction would not necessarily raise red flags.

[¶62] As to the lack of documents executed for the disputed properties, Robert Redland cites to no testimony or other evidence suggesting that the parties had agreed this is the way each property transfer would be treated. Moreover, the district court's findings reflect that Robert Redland led the discussions concerning the Redland Family Trust and steered the transactions:

4. Prior to the Family Trust being signed by the members of the family in 1989, Robert repeatedly told Rolly and Kendrick that he intended to transfer all State Leases and BLM Permits and deeded lands held in his own name to the Family Trust; and that he intended all parties and the Trust to keep the operation in the family;

\* \* \*

11(e). At the meeting, Robert indicated that he wanted to to (sic) secure and purchase for the family all of the land that Kendrick, Bob and Rolly were running their livestock on including the Farm at Manderson, the Woody Place at Ten Sleep, the Mountain Ground and the BLM & State grazing leases attached to those grounds. Bob made it very clear that all the ground Kendrick, Bob and Rolly were running on would eventually go into the trust over time and if Uncle Eric (Pooch) Redland's ground became available, his part of the Mountain & Slope, the State Farm, or his ranch at Ten Sleep became available in the future, the Redland Family needed to be in a position to acquire those parcels also, so they could be put in the Family Trust.

\* \* \*

19. Prior to any funds being taken by Robert to purchase property, Rolly communicated to Robert that he was aware they were settling Uncle Eric Redland's estate, and asked if Robert would allow Rolly to purchase the State Farm [being State Lease #3-8179] from Eric's estate so [he] could have a home there. Robert replied that he could not do that, as it had to go through him and then into the Redland Family Trust by and through Robert as Trustee. \* \* \*

\* \* \*

26. [After the $40,000 check Kendrick Redland wrote to Robert Redland for the purchase of the State Farm] cleared

32

and had come with the bank statement, Sharon [Redland] asked Kendrick why he didn't just write the check directly to Eric Redland's Estate. Kendrick explained to Sharon that Robert told him that everything going into the Trust had to go through Robert and Irene to keep the trust legal. As a consequence, on March 9, 1992, Kendrick wrote check #302 to Bob Redland for $40,000. * * *

* * *

42. From August, 1989, Rolly and Kendrick made considerable improvements to property that they thought was Trust property, without Robert saying a word.

43. In about 2003, Irene requested that Deb Redland and her boys move to the State Farm, so that the boys could go to school there. Debbie contacted all of the Redland children to see if they approved of her moving to the State Farm. She did so because she thought the State Farm had been placed in Trust. After Debbie moved to the State Farm, Rolly and Bob ran cows there until Robert evicted them after this lawsuit was filed.

44. At some point after December, 1991, Rolly was looking at his CD and determined that about $60,000.00 had been withdrawn by Robert to purchase the property from Eric's Estate. During the mid-1990's Rolly and Robert were traveling through South Dakota by car. At that time, Rolly asked Robert why so much money was taken out his CD by Robert in 1991. Robert said he needed to finish the deal with Eric's Estate and everything out of Eric's Estate was purchased and placed in the Family Trust with the money. Rolly believed his father at that time, and had no reason to believe Robert had not put the State Farm in the Family Trust.

45. In the fall of 2007 when Irene Redland was in the hospital in Omaha, Nebraska, Teresa, Lisa and Robert were in the hospital lobby. Teresa had been made aware that Robert may not have put all of the land into the Family Trust and she stated to Bob, that he had promised to put all of the land into the Family Trust, and asked if he promised at that time that it had all been placed in the Family Trust. Bob said he promised that all the property had been placed in the Family

33

Trust. This testimony went unchallenged by Lisa Kimsey or Robert Redland at the second trial.

> 46. A meeting occurred in November, 2007 at the offices of Worrall and Greear in Worland. Robert, Lisa, Rolly, Kendrick, Teresa and Sharon were in attendance at the meeting. The meeting was contentious with everyone knowing that Robert had not in fact placed all of the property in the Family Trust. At some point during the meeting, Teresa confronted Bob and said: "You remember when we were in Omaha, and I asked you if you promised that all of the land was placed in the Trust, and you told me that you promised it had." Robert then replied in front of everyone— "I was going to put the land into the Trust, but things changed." This evidence went uncontested by Lisa or Robert at the second trial.

[¶63] The court's findings show that Robert Redland was assuring his sons the transactions were being conducted as required for the Trust, there were no disruptions in the operations and no objections to the improvements his sons were making to the disputed properties, and as late as 2007, Robert was making assurances that all was going as planned and the properties agreed upon were being placed in the Trust. Under these circumstances, we again can find no clear error in the district court's finding no red flags related to the manner in which the transactions were completed.

[¶64] Finally, we reject Robert Redland's argument that given how much the Redland Children, and in particular Rolly and Kendrick, had invested in the operation, they should have been more diligent in verifying what he was telling them. Nothing in the district court's findings or in the evidence cited by Robert suggests that the circumstances and relationships among the parties warranted that level of suspicion. Additionally, this argument that even in the absence of some triggering alert, a party has a duty to verify transactions through property records is contrary to our holding in *Redland I*. In *Redland I*, we rejected this type of imputed notice argument, and held that the discovery rule instead requires an examination of the surrounding circumstances. *Redland I*, ¶ 63, 288 P.3d at 1188. We explained:

> Our decision in a recent easement dispute illustrates this inquiry. In *Carnahan*, Lewis, a property owner asserting access rights based on a public access easement, brought an action against Carnahan, the burdened property owner. *Carnahan*, ¶ 1, 273 P.3d at 1067. Lewis did not file the action until 2007 when Carnahan installed a locked gate across the

access road. *Id*. Carnahan moved for summary judgment, asserting that the statute of limitations began to run in 1994 when the prior owners of the Carnahan property recorded a vacated plat attempting to eliminate the easement. *Id.*, ¶ 2, 273 P.3d at 1067. The district court denied summary judgment, finding that questions of fact existed as to when Lewis knew or had reason to know of the cause of action. *Id*.

After a bench trial, the district court held that the limitations period did not begin to run until 2007. The court reasoned that the Lewises did not have notice of the need to bring suit to enjoy use of the easement until 2007 when the Carnahans erected the locked gate across the easement. *Carnahan*, ¶ 30, 273 P.3d at 1075. Our Court affirmed, concluding:

> The district court's findings are supported by the record. Mr. and Mrs. Lewis testified that they used Mountain View Loop on a regular basis from the time they purchased the unplatted property in 1994 until the Carnahans blocked access by installing a fence and a gate in 2007. Mr. Lewis testified that from 2003 when the Carnahans bought the property until they installed the fence and gate in 2007, he and his wife continued to use Mountain View Loop without objection from the Carnahans. Although Troy Griffith put up a gate and a no trespassing sign in 1995 or 1996, the Lewises testified they continued to use Mountain View Loop without objection by driving through the gate when it was open or opening the unlocked gate when it was closed. Troy Griffith testified that he saw the Lewises using Mountain View Loop, they were welcome on his property and he never denied them access to his property. Noel Griffith testified that he never instructed the Lewises not to drive on Mountain View Loop. Mr. Carnahan also testified that he did not object to Mr. Lewis driving on the portion of Mountain View Loop on the Carnahans' property because he was trying to be neighborly.
>
> In addition to this evidence, Mr. Lewis testified that he was not told prior to purchasing the unplatted portion

of his property in 1994 that Mountain View Loop had been vacated. Mr. Lewis testified that he did not look at the official plat recorded with the county when he purchased the property and was not aware of the attempt to vacate Mountain View Loop; he relied on the plat provided to him by the seller. He testified that when he purchased additional tracts in 1999, the developer assured him Mountain View Loop was intact. Mr. Lewis testified that he became aware in 2003 that the Griffiths were trying to re-plat their property to remove tract lines and Mountain View Loop. He attended county meetings concerning the re-plat and was present when the Board of County Commissioners denied the re-plat. Based on the denial, Mr. Lewis believed the matter was settled. He testified that it was not until after the Carnahans installed the fence and locked gate in 2007 that his family was denied use of Mountain View Loop.

*Carnahan*, ¶¶ 30–31, 273 P.3d at 1075.

We went on to explain that "the Lewises were not chargeable with information which should have lead them to believe they had a claim until 2007 when their access to and use of Mountain View Loop was obstructed by the Carnahans' erection of a fence with a locked gate." *Carnahan*, ¶ 32, 273 P.3d at 1075. That is, we looked beyond what was recorded in the property records and did not charge the plaintiff with that knowledge. Our approach is instead to consider all of the surrounding circumstances to determine when a plaintiff had reason to know of a property dispute.

*Redland I*, ¶¶ 64-66, 288 P.3d at 1188-89 (footnote omitted).

[¶65]  Based on the foregoing, we find no clear error in the district court's conclusions that the Redland Children did not have notice of their cause of action until 2007 and their 2008 complaint was not barred by the statute of limitations.  Having found no clear error in the court's application of the discovery rule, we need not address the court's findings and conclusions concerning when the Redland Children's cause of action accrued.

C.      **District Court's Disposition of Manderson Property**

[¶66] As a final matter, we address Robert Redland's argument that the district court erred because it "judicially created for Robert Redland a Last Will and Testament that directs the distribution of his property upon his death." This relates to the court's order that the Manderson Place be placed in the Redland Family Trust upon Robert's death. While we do not see the court's order as a judicially created will, we do agree that the court's order in this regard creates logistical difficulties. We therefore modify this portion of the court's order.

[¶67] It is undisputed, based on the court's findings and the testimony, that the parties agreed that the Manderson Place would be the last property placed in the Redland Family Trust, it would not be placed in the Trust until after the deaths of both Irene and Robert Redland, and Irene and Robert Redland would have the use of the Manderson Place during their lifetimes. The parties' agreement appears in all respects to be an agreement that Robert and Irene would have a life estate in the Manderson Place, which estate is described as follows:

> A "life estate" is an estate whose duration is limited to the life of the party holding it, or some other person. It is an estate in realty in which a vested remainder or a present reversionary interest exists, and presupposes a fee existing elsewhere than in the life tenant. There can be no life estate in property without a remainder.
>
> A life estate is not an estate of inheritance, but is a freehold estate. A life estate is not merely a right to occupy the property. During the life of the life tenant he or she is, as a general rule, an owner of the property.
>
> A life estate may be made to depend on a contingency, on the happening of which the estate may be entirely defeated before the death of the grantee, as for example, where an estate is given to a woman during widowhood or while single. The indefinite duration of the estate and the fact that it may continue for life places it within the category of estates for life; it matters not how contingent or uncertain the duration of the estate may be, or how probable is its termination in a limited number of years, if it is capable of enduring for the term of a life.
>
> The life tenant possesses a legal and beneficial interest or title during his or her life. More specifically, a "life estate" is one in which the donee has certain powers over the property

37

during his or her lifetime, subject to the rights of remaindermen who have an interest in the property upon the death of the donee. Under the common law, the interests of the owner of a life estate and that of the remainderman are not inconsistent with each other because possession of the remainder is postponed.

31 C.J.S. *Estates* § 35 (Updated December 2014) (footnotes omitted).

[¶68]  To limit confusion and the potential for future disputes, we remand to the district court to modify its order concerning the disposition of the Manderson Place.  The modified order shall direct Robert Redland to immediately and forthwith execute any documents necessary to transfer the Manderson Place to the Redland Family Trust, subject to a life estate in Robert Redland that shall terminate on his death.

[¶69]  We affirm the district court's order, and we order a limited remand for the purpose described above.