In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 14-1949

DANIEL AVILA, on behalf of himself
and all other persons similarly situated,

*Plaintiff-Appellant*,

*v.*

CITIMORTGAGE, INCORPORATED,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 3566 — **Ronald A. Guzmán**, *Judge*.

_____

ARGUED SEPTEMBER 29, 2014 — DECIDED SEPTEMBER 4, 2015

_____

Before EASTERBROOK, WILLIAMS, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Daniel Avila alleges that CitiMortgage, Inc., violated a fiduciary duty and breached its mortgage agreement with him by using the payout from his homeowner's insurance policy to pay down his loan rather than repair his damaged house. The district court dismissed Avila's suit—a proposed class action—for failure to state a

claim, reasoning that (1) his allegations do not support a fiduciary duty on CitiMortgage's part; and (2) Avila was barred from pursuing his contract claim because he had materially defaulted on his own contractual obligations by missing several mortgage payments prior to CitiMortgage's purported breach.

We agree with the district court on the first point: Avila's allegations of a fiduciary relationship are inadequate as a matter of law. But his claim that the mortgage agreement remained enforceable after his missed payments is plausible in light of the agreement's structure and the remedies it prescribes in the event of default. The breach-of-contract claim should not have been dismissed.

## I. Background

Avila bought his Chicago home in 2005 with a $100,500 mortgage loan from CitiMortgage. Five years later, a serious fire made the house uninhabitable. Avila filed a claim with his homeowner's insurance carrier, which paid out just over $150,000. Pursuant to the terms of the mortgage agreement, CitiMortgage took control of the insurance proceeds. Avila selected a contractor, and CitiMortgage paid $50,000 of the insurance money to get the restoration underway. CitiMortgage later inspected the work and found that it was of poor quality and needed to be redone, but by that time Avila had missed several mortgage payments. CitiMortgage then applied the remaining $100,000 from the insurance payout toward Avila's outstanding mortgage loan. Avila's home was never repaired.

The parties' respective obligations regarding homeowner's insurance are spelled out in section 5 of the mortgage agreement.[1] Avila was required to obtain a homeowner's policy that included a standard mortgage clause and named CitiMortgage as a loss payee.[2] CitiMortgage had the right to disapprove Avila's choice of carrier, take possession of the insurance documents, and demand proof that Avila was paying the premiums.

Section 5 also addressed the parties' obligations in the event that damage to the property resulted in an insurance claim:

> Unless Lender and Borrower otherwise agree in writing, any insurance proceeds … shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure that the work has been completed to Lender's satisfaction … . … Lender shall not be required to pay Borrower any interest or earnings on such

---

[1] The mortgage agreement was based on the Fannie Mae/Freddie Mac Uniform Instrument for single-family homes in Illinois.

[2] As we discuss in more detail later, "the 'standard' mortgage clause … forms a separate and distinct contract between the insurer and the mortgagee, the effect of which is to shield the mortgagee from being denied coverage based upon the acts or omissions of the insured or the insured's noncompliance with the terms of the policy." *Old Second Nat'l Bank v. Ind. Ins. Co.*, 29 N.E.3d 1168, 1175 (Ill App. Ct. 2015).

> proceeds. … *If the restoration or repair is not eco-*
> *nomically feasible or Lender's security would be*
> *lessened, the insurance proceeds shall be applied to*
> *the sums secured by this Security Instrument,*
> *whether or not then due, with excess, if any, paid to*
> *Borrower.*

(Emphasis added.) Section 5 also provided that CitiMortgage could use the insurance proceeds to pay down the loan on the occurrence of any of three additional conditions: if the borrower abandoned the property, ignored notice concerning the insurance carrier's offer to settle a claim, or if CitiMortgage foreclosed on the property.

As we've noted, CitiMortgage used the insurance proceeds to pay down the loan rather than repair the house, but it never claimed that restoration was economically infeasible or would reduce its security interest. Nor had any of the three special conditions described above occurred.

Avila sued CitiMortgage in Cook County Circuit Court alleging that its actions breached a fiduciary duty and the mortgage contract. He sought to represent a class of all defaulting CitiMortgage borrowers whose homeowner's insurance proceeds had been applied to their mortgage loans rather than home repairs. CitiMortgage removed the case to federal court.[3]

---

[3] Federal jurisdiction arose under the Class Action Fairness Act, 28 U.S.C. § 1332(d), based on minimal diversity. After an Illinois-based codefendant was dropped, the parties became completely diverse, so jurisdiction was also proper under 28 U.S.C. § 1332(a)(1).

CitiMortgage moved to dismiss for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6). The district court granted the motion, concluding that CitiMortgage owed no fiduciary duty and Avila was precluded from bringing a breach-of-contract claim because his default on his payment obligations preceded CitiMortgage's alleged breach.[4] The dismissal order was without prejudice, and Avila twice tried to amend his complaint. The later iterations of the complaint were also dismissed—the last one with prejudice. This appeal followed.

## II. Discussion

We review de novo the judge's order dismissing Avila's complaint under Rule 12(b)(6) for failure to state a claim. *Carmody v. Bd. of Trs. of the Univ. of Ill.*, 747 F.3d 470, 471 (7th Cir. 2014). To survive a motion to dismiss, a complaint must contain sufficient factual allegations to state a claim for relief that is legally sound and plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Avila brought state-law claims for breach of fiduciary duty and breach of contract. Illinois law controls.

### A. Fiduciary Duty

Avila alleges that CitiMortgage's use of his homeowner's insurance proceeds to pay down his mortgage loan was a

---

[4] Avila's initial complaint also alleged claims for conversion and negligence. These claims too were dismissed, and Avila does not challenge this aspect of the judge's ruling.

breach of its duty as a fiduciary. "[I]n order to state a claim for breach of fiduciary duty, [a complaint] must … allege[] that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains." *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000). The judge concluded that Avila's complaint failed to allege facts sufficient to support the existence of any fiduciary duty. We agree.

"A fiduciary relationship exists when there is a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one reposing the confidence." *Hensler v. Busey Bank*, 596 N.E.2d 1269, 1274 (Ill. App. Ct. 1992). Some fiduciary relationships exist as a matter of law (e.g., the attorney-client relationship), but the mortgagor-mortgagee relationship is not one of them.[5] *See Teachers Ins. & Annuity*

---

[5] Where the alleged fiduciary relationship does not exist as a matter of law, Illinois requires that the facts from which the fiduciary relationship arises be "pleaded and proved by clear and convincing evidence." *Hensler v. Busey Bank*, 596 N.E.2d 1269, 1275 (Ill. App. Ct. 1992). But federal pleading standards apply when considering a motion to dismiss a complaint that rests on diversity jurisdiction. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670–72 (7th Cir. 2008) (discussing the contemporary framework for determining whether a federal procedural rule applies); *Caraluzzi v. Prudential Sec., Inc.*, 824 F. Supp. 1206, 1213 (N.D. Ill. 1993) (holding that federal pleading standards control in a breach-of-fiduciary-duty action brought under Illinois law); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 1204 (3d ed. 2004) ("[The] suggesti[on] that state pleading tests must be followed insofar as the manner or the particularity of pleading in a federal court … [is] erroneous … ."). To survive CitiMortgage's motion to dismiss, Avila only needed to plead facts that plausibly stated a claim for relief arising out of CitiMortgage's violation of a fiduciary duty.

*Ass'n of Am. v. La Salle Nat'l Bank*, 691 N.E.2d 881, 888 (Ill App. Ct. 1998). Avila counters that the fiduciary relationship at issue in this case "is limited to the use of the insurance proceeds" and arose because "the insurance proceeds [were] placed in the hands of [CitiMortgage]," thus "creat[ing] an escrow" under Illinois law.

An escrow is "[a] legal document or property delivered by a promisor to a third party to be held by the third party for a given amount of time or until the occurrence of a condition, at which time the third party is to hand over the document or property to the promisee." BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Wiczer v. Wojciak*, 30 N.E.3d 670, 679 (Ill. App. Ct. 2015). In effect, an escrow reduces the degree of trust necessary to complete a deal by reducing the risk that one party won't turn over money or documents as promised. Under Illinois law "[a]n escrow agent has a fiduciary duty to the party making the deposit and the party for whose benefit the deposit is made. As a result, an escrow agent must act impartially toward all parties."[6] *Wells Fargo Bank Minn., N.A. v. EnviroBusiness, Inc.*, 22 N.E.3d 125, 136 (Ill. App. Ct. 2014) (citation omitted). More specifically, an escrow agent's "duty [is] to act only in accordance with the … escrow instructions." *Int'l Capital Corp. v. Moyer*, 806 N.E.2d 1166, 1170 (Ill. App. Ct. 2004). If under the mortgage agreement CitiMortgage was an escrow

---

[6] Illinois courts have described escrow agents both as "special agents" and "trustees," *see Estate of Reinhold v. Mansfield*, 412 N.E.2d 1146, 1149 (Ill. App. Ct. 1980), but in either case the agent assumes fiduciary duties, *see Albrecht v. Brais*, 754 N.E.2d 396, 399 (Ill. App. Ct. 2001) (distinguishing an escrow agent from a trustee).

agent, then Avila has adequately alleged the existence of a fiduciary duty.

CitiMortgage objects that Avila's escrow theory comes too late—he never used the word "escrow" in any of his three complaints and did not argue below that a fiduciary relationship between the parties arose based on an escrow. There's no question that Avila could have helpfully clarified his case if he had characterized the alleged fiduciary relationship as an escrow from the beginning. That said, plaintiffs are not required to plead specific legal theories. *King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014). Avila's complaint alleged that a fiduciary duty existed because "Citi[Mortgage] had the right to retain exclusive control over these insurance proceeds" and he "had no right to object to or interfere with Citi[Mortgage]'s determination regarding the satisfactory completion of the [repair] work." These allegations gave CitiMortgage and the court adequate notice of the scope of, and basis for, the alleged fiduciary relationship. *Cf. Vincent v. City Colleges of Chi.*, 485 F.3d 919, 923 (7th Cir. 2007) (holding that Rule 8(a)(2) of the Federal Rules of Civil Procedure "calls for a short and plain statement; the plaintiff pleads claims, not facts or legal theories").

It's true that Avila did not utter a word about an "escrow theory" in opposition to any of CitiMortgage's Rule 12(b)(6) motions in the district court. Issues raised for the first time on appeal are generally treated as waived. *County of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 820 (7th Cir. 2006) (explaining that new factual allegations may be considered on appeal if consistent with the complaint, but new *issues* raised for the first time on appeal ordinarily will not be

addressed). Even if we set the waiver aside, however, Avila's escrow theory comes up short.

"The dominant party must *accept* the responsibility, *accept* the trust of the other party before a court can find a fiduciary relationship." *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992) (emphases added); *see also DeWitt Cnty. Pub. Bldg. Comm'n v. County of DeWitt*, 469 N.E.2d 689, 701 (Ill. App. Ct. 1984) ("Those who have in the law's view been strangers remain such, unless both consent by word or deed to an alteration of that status." (quoting *S. Trust Co. v. Lucas*, 245 F. 286, 288 (8th Cir. 1917))). Section 5 of the mortgage agreement does not explicitly create an escrow, and nothing in Avila's complaint supports an inference that CitiMortgage affirmatively accepted the role of escrow agent. Still, the existence of an escrow, like any fiduciary relationship, can "be determined from the relations of the parties and their respective rights and duties." *Albrecht v. Brais*, 754 N.E.2d 396, 399 (Ill. App. Ct. 2001). Avila argues that section 5 *implicitly* creates an escrow. In other words, he argues that the implied escrow is so self-evident that CitiMortgage accepted the duties of escrow agent merely by entering into the mortgage agreement. This is essentially a question of contract interpretation.

The function of an escrow agent is to serve as intermediary, faithfully delivering the escrowed property in strict conformity with the instructions issued by the parties to the escrow agreement. *See Wiczer*, 30 N.E.3d at 679; *Int'l Capital Corp.*, 806 N.E.2d at 1170. Avila says that CitiMortgage is the intermediary between his insurance carrier and himself. But that's not an accurate characterization of CitiMortgage's role. The insurance carrier was not party to the mortgage agree-

ment and thus could not be the grantor in any escrow created by section 5. The insurance carrier's involvement was completed as soon as it issued the check for the policy proceeds; it gave no instructions about how CitiMortgage should use the money, and without instructions there can be no escrow.[7]

Instead, section 5 is an agreement between Avila and CitiMortgage alone. And as a term of the contract, it exists almost exclusively for CitiMortgage's benefit. Without section 5, Avila could use the insurance proceeds to repair his house or pay down his loan at his discretion. The mortgage agreement shifts that discretion to CitiMortgage to ensure that repairs are "economically feasible," that its "security is not lessened," and that it will have "an opportunity to inspect such Property to ensure the work has been completed to [its] satisfaction."[8] Avila suggests that these are the escrow instructions, but it's not consistent with a typical escrow arrangement to give an escrow agent authority to make self-interested and discretionary decisions about when and where to disburse the escrowed funds. Contract law imposes an implied duty of good faith on parties empowered by the contract to exercise discretion, *see RBS Citizens*,

---

[7] Avila's homeowner's insurance policy is not in the record, but any conditions it might impose on the use of the insurance proceeds are independent of the obligations imposed on CitiMortgage in section 5 of the mortgage agreement.

[8] The fact that Avila will also benefit from the insurance funds in the sense that they will ultimately be used either to repair his house or pay down his mortgage loan does not alter the conclusion that the *purpose* of the arrangement in section 5 is to enable CitiMortgage to protect its own interests, not Avila's.

*Nat'l Ass'n v. RTG-Oak Lawn LLC*, 943 N.E.2d 198, 206–07 (Ill. App. Ct. 2011), but that duty doesn't create a fiduciary relationship. Simply put, nothing in section 5 indicates that CitiMortgage assumed a duty to act for Avila's benefit in place of its own. *See* RESTATEMENT (THIRD) OF TRUSTS § 2 cmt.b (2003) ("Despite the differences in the legal circumstances and responsibilities of various fiduciaries, one characteristic is common to all: a person in a fiduciary relationship to another is under a duty to act for the benefit of the other as to matters within the scope of the relationship.").

There's another important way in which CitiMortgage differs from a typical escrow agent: While "[a]n escrow agent … is not vested with title to the property," *Albrecht*, 754 N.E.2d at 399, CitiMortgage *did* have title to the insurance proceeds. CitiMortgage was a loss payee under the insurance policy, as well as the beneficiary of the insurance contract's standard mortgage clause.[9] *See* GRANT S. NELSON & DALE A. WHITMAN, REAL ESTATE FINANCE LAW 173 (5th ed. 2007) ("The effect of the [standard mortgage] provision is to insure the mortgagee's interest, as fully and to the same extent as if the mortgagee had taken out a separate policy directly from the insurer … ."); *Old Second Nat'l Bank v. Ind. Ins. Co.*, 29 N.E.3d 1168, 1175 (Ill. App. Ct. 2015). In other words, CitiMortgage was not merely a custodian of Avila's money; the insurance proceeds were issued to CitiMortgage directly, and it had a property interest in them. While it's

---

[9] Avila emphasizes that section 5 says that CitiMortgage will "hold" the insurance proceeds. That single use of the term does not alone change the formal legal relationships established by or mandated in the mortgage agreement.

common for escrow agents to be compensated out of the funds in the escrow, it's not consistent with an escrow for the agent to have title to those funds *while* they remain in escrow.

This conclusion is bolstered by the fact that CitiMortgage expressly agreed to the creation of escrows (and to be an escrow agent) elsewhere in the mortgage agreement. Specifically, section 3 allows for the use of escrows to pay for property taxes, lease payments, insurance premiums, and community association dues. The "Definitions" section of the mortgage contract defines "Escrow Items" solely as "those items that are described in [s]ection 3."

Comparing sections 3 and 5 is telling. Section 3 allows third-party banks to collect money from Avila and disburse it to the relevant tax authorities, insurance carriers, and homeowner's associations in accordance with the instructions agreed to by Avila and CitiMortgage. These "instructions" are clear and the payment amounts are fixed by law or contract. Distribution of the escrowed funds is not subject to the escrow agent's discretion, nor is the agent entitled to determine whether a given use of the funds furthers its own economic interests. Finally, the intermediary bank does not have an independent property interest in the funds—it's just a custodian until the money can be paid out in accordance with the escrow instructions.

Section 3 expressly authorizes CitiMortgage to serve as the escrow agent, assuming it is "an institution whose deposits are insured by a federal agency." But the important point is that its *function* is simply to possess the funds and disburse them in accordance with the escrow instructions. There can be no conflict of interest between Avila and

CitiMortgage with respect to the section 3 escrows because both parties share a common interest in ensuring that the taxes, premiums, and fees are paid on time. Also, section 3 (unlike section 5) requires CitiMortgage, if it's serving as escrow agent, to provide an annual accounting of the escrowed funds. *Cf. Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 649 N.E.2d 511, 517 (Ill. App. Ct. 1995) (noting, in the course of finding that no escrow existed, that "the purchase agreement in the case at bar did not call for setting up an escrow account or for segregating the funds").

In sum, while the parties clearly intended for section 5 to govern their interlocking contractual obligations with respect to Avila's homeowner's insurance policy, Avila has not plausibly alleged that CitiMortgage assumed any additional, extra-contractual duties of a fiduciary nature. *See Zelickman v. Bell Fed. Sav. & Loan Ass'n*, 301 N.E.2d 47, 51 (Ill. App. Ct. 1973) (holding that a fund from which the lender paid insurance premiums on behalf of the homeowner was not a trust but rather "an additional contractual security device for the protection of defendant's rights as creditor, specifically agreed to in the contract between the parties"). The claim for breach of a fiduciary duty was properly dismissed.

**B. Breach of Contract**

Avila's breach-of-contract claim is based on the following language from section 5: "Unless Lender and Borrower otherwise agree in writing, any insurance proceeds … *shall be applied* to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security interest is not lessened." (Emphasis added.) Because

CitiMortgage never indicated that repairing the house was economically infeasible or would harm its security interest, Avila argues that it breached the mortgage agreement. He also points out that the other three conditions listed in section 5 that would permit CitiMortgage to use the insurance proceeds to pay down the loan—abandonment, the failure to respond to an insurance settlement, and foreclosure—did not occur.

The judge concluded that Avila could not prevail on his breach-of-contract claim *even assuming* CitiMortgage had, in fact, breached section 5. The elements of a claim for breach of contract are (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff. *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004). The judge reasoned that since Avila had defaulted on his mortgage payments prior to CitiMortgage's alleged misuse of the insurance proceeds, he fell short on the "substantial performance" element of the claim. *See* RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981) ("[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."). Avila responds that the parties intended that section 5 would remain enforceable even after a default by the borrower.

Section 22 of the mortgage agreement describes CitiMortgage's remedies in the event of a default by the homeowner. Specifically, the lender is entitled to accelerate a loan and initiate judicial foreclosure proceedings, but only

after giving the homeowner notice of the alleged default and providing 30 days to cure it. (Acceleration in turn triggers the borrower's right to reinstate the mortgage agreement if certain conditions are met.) Avila argues that because section 22 establishes a specific process for dealing with a default, the homeowner's first default would not make the mortgage agreement thereafter wholly unenforceable. And while CitiMortgage could have accelerated Avila's loan in response to his default, applying the insurance proceeds to pay down his loan balance was not a remedy for missed payments.

That's a reasonable reading of the mortgage contract. Section 5 appears to envision the survival of its terms after a default. As we've explained, that section gives CitiMortgage the right to apply insurance proceeds toward the outstanding loan balance under certain specified conditions, including the homeowner's abandonment of the property or foreclosure by CitiMortgage. Abandonment is a default per se under certain circumstances (under section 6 of the agreement), and foreclosure necessarily follows a default. These provisions of section 5 would be superfluous if *any* default immediately gave CitiMortgage the right to apply an insurance payout toward the mortgage loan. *See Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004) ("[A] contract[] is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose.").

Indeed, CitiMortgage concedes that the mortgage agreement does not become a nullity at the moment of default, though it apparently thinks that the contract becomes entirely *unenforceable* (from the breaching party's perspective) from

that point forward. But CitiMortgage's position would give it a carte blanche of indeterminate duration to hold Avila to his contractual obligations while its own performance is subject to nothing but its own whims.

Contracting parties are free to negotiate in advance how breaches should be handled. For example, a nondefaulting party cannot recover in excess of the amount it agreed to in a liquidated damages clause, regardless of its actual damages. *See Berggren v. Hill*, 928 N.E.2d 1225, 1229 (Ill. App. Ct. 2010). A contrary holding would raise equitable concerns similar to those addressed by the election-of-remedies principle, which holds that

> [i]f a party to a contract breaks it, the other party can abandon the contract (unless the breach is very minor) and sue for damages, or it can continue with the contract and sue for damages. But if it makes the latter election, it is bound to the obligations that the contract imposes on it.

*Emerald Invs. Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008) (citations omitted); *see also Omni Partners v. Down*, 614 N.E.2d 1342, 1346 (Ill. App. Ct. 1993) ("[I]f the injured party chooses to continue performance, he has doubtless lost his right to stop performance."); 14 SAMUEL WILLISTON & RICHARD A. LORD, WILLISTON ON CONTRACTS § 43:15 (4th ed. 2014) ("[B]y outward manifestations indicating that the defective performance has been accepted, the obligor has sent the unmistakable signal—by conduct, rather than by an express promise—that it still considers the contract to be binding.").

In light of the bargained-for remedies for default contained in section 22 of the mortgage agreement, and the presumption against superfluity as applied to section 5, Avila has stated a facially plausible claim that the parties did not intend that his missed payments preclude him from enforcing section 5 of the agreement. Though CitiMortgage could have accelerated Avila's loan in response to his missed mortgage payments, it did not do so.

CitiMortgage cites *Hukic v. Aurora Loan Services*, 588 F.3d 420 (7th Cir. 2009), for the proposition that a borrower's breach makes him powerless to enforce a mortgage agreement. That's a significant overreading of the opinion. Hukic's mortgage agreement required him to provide his lender with proof that he was paying his property taxes and insurance premiums. If he didn't, the lender was entitled to pay the taxes and insurance itself and then add the costs to the monthly mortgage payment. *Id*. at 433. Hukic paid his taxes and premiums but ignored the lender's repeated requests for proof of payment and then sued when the lender paid the bills on his behalf. *Id*. We affirmed the dismissal of Hukic's breach-of-contract claim. *Id.* As we explained in a later case, "Hukic's failure to comply with his contractual obligations was material and absolved the servicers from liability because it directly caused the servicers' actions that were the basis of his own breach of contract claims." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 692 (7th Cir. 2011).

Here, Avila's claim is that CitiMortgage's use of the insurance proceeds to reduce his loan was *not* a contractually permitted response to his default. In *Hukic* the lender's response to the borrower's default was expressly permitted. The two cases are not analogous.

CitiMortgage also claims that Avila's complaint is defective unless it asserts his compliance with each and every affirmative duty imposed on him by the mortgage agreement. We disagree, for essentially the same reasons discussed above; Avila has pleaded a facially plausible claim that the mortgage agreement survived his default. The possibility that Avila has other unknown (and uncured) defaults does not necessarily defeat his claim.

We do not, of course, express any view on the ultimate merits of Avila's claim. CitiMortgage may have contract defenses that eventually prove decisive. Perhaps Avila's suit should be barred because he breached the contract by filing suit without providing the lender with notice and a "reasonable period" in which to "take corrective action," as required by section 20. Perhaps CitiMortgage can muster evidence that the parties did not intend for section 22 to be conclusive as to CitiMortgage's remedies in the face of a default and in fact wanted the breaching party to be precluded from enforcing the mortgage agreement. Or perhaps CitiMortgage can revive its argument—rejected in passing by the district court—that Avila suffered no economic damages because the insurance proceeds reduced his loan balance. None of these potential defenses have been litigated, and they were not part of the judge's order dismissing the case. CitiMortgage is free to raise them on remand.

For the foregoing reasons, we AFFIRM the dismissal of the claim for breach of fiduciary duty, REVERSE the dismissal of the breach-of-contract claim, and REMAND for further proceedings consistent with this opinion.