# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 96

OCTOBER TERM, A.D. 2016

October 6, 2016

MAVERICK BENEFIT ADVISORS,
LLC; MOUNTAIN BENEFIT
ASSOCIATES, LLC; TAYLOR H.
HAYNES; and ELISABETH A.
WASSON,

Appellants
(Plaintiffs/Third Party Defendants),

v.                                                               S-16-0030

DAVID J. BOSTROM; BOSTROM
ENTERPRISES, LLC; and MOUNTAIN
STATES REVIEW, INC.,

Appellees
(Defendants/Third Party Plaintiffs).

*Appeal from the District Court of Washakie County*
*The Honorable David B. Park, Judge*

*Representing Appellants:*
> Douglas W. Bailey and Henry F. Bailey, Jr. of Bailey|Stock|Harmon|Cottam P.C.,
> Cheyenne, Wyoming.  Argument by Mr. Douglas Bailey.

*Representing Appellees:*
> Timothy W. Miller of Miller Law Office, Casper, Wyoming.

*Before BURKE, C.J., and HILL, DAVIS, FOX, JJ, and DAY, D.J.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]    The purchasers of a health claims administration company learned that they had not acquired all the assets they contracted to purchase.  After continuing to operate the business for 18 months, they stopped making payments on the Promissory Note and commenced an action asserting breach of contract, among other claims.  The seller counterclaimed for breach of contract, seeking full payment under the Asset Purchase Agreement, and the purchasers raised the affirmative defense that seller was first to breach.  At trial, at the close of the purchasers' evidence, the district court granted seller's Rule 50 motion for judgment as a matter of law.  It held that the purchasers failed to prove damages, and noted that rescission was no longer available because they elected to seek damages.  The district court went on to enter judgment in favor of the seller, ruling that the purchasers' first-to-breach affirmative defense was no longer available.  We conclude that because they continued operating the business long after they had knowledge of the seller's alleged breach, the purchasers waived the first-to-breach affirmative defense, and we affirm the district court's order.

## ISSUES

[¶2]    We consolidate and restate the issues as follows:

    1.    May the purchasers assert the first-to-breach affirmative defense on the seller's breach-of-contract counterclaim?

    2.    Does the seller have a contractual right to its attorney fees on appeal?

## FACTS

[¶3]    Mountain Benefit Associates, LLC (MBA) is a third-party administrator of health benefit plans for self-insured and partially self-insured employers.  David Bostrom started MBA in the mid-1980s.  In August or September of 2009, Mr. Bostrom approached Taylor Haynes (Dr. Haynes) regarding his potential purchase of MBA, and over the course of the next few months, Mr. Bostrom; Dr. Haynes; and Elisabeth Wasson, Dr. Haynes' wife, had a number of discussions and written communications regarding the sale of MBA.  During that time, Mr. Bostrom provided Dr. Haynes and Ms. Wasson with information, including enrollment records for the clients of MBA.  In addition, Dr. Haynes and Ms. Wasson submitted written questions to Mr. Bostrom.

[¶4]    One such question asked for a "[b]rief description of any significant client relationships severed within the last two years."  In response, Mr. Bostrom identified three groups that had terminated their relationships with MBA over the last two years.  Ms. Wasson explained that because the major asset they were purchasing was the client list, or MBA's book of business, the retention rate of MBA's clients was significant to

1

her when she evaluated the business. Mr. Bostrom represented that MBA had a client retention rate of 98 percent.

[¶5] On February 1, 2010, Dr. Haynes and Ms. Wasson's business, Maverick Benefit Advisors, LLC (Maverick), entered into an Asset Purchase Agreement with MBA pursuant to which Maverick was to purchase MBA's health insurance claims administration business. That agreement contained a provision warranting the information provided by MBA was true:

> The representations and warranties of the Seller contained in this Agreement or other instrument furnished by the Seller pursuant to this Agreement do not contain any untrue statement of a material fact and do not omit to state any fact necessary to make any statement herein or therein not misleading or necessary to a correct presentation of all material aspects of the Business and the matters contemplated under this Agreement.

Maverick agreed to pay a total of $4,395,582 for the business. Maverick paid one-half of the purchase price in cash and executed a Promissory Note for the remaining balance of $2,197,791. Maverick's principals, Dr. Haynes and Ms. Wasson, personally guaranteed the note. In addition, Maverick entered into a Personal Service Contract with Mr. Bostrom, the previous owner of MBA, to secure his assistance with the transition in ownership and management of the business.

[¶6] Ms. Wasson testified that over the next 18 months, she discovered a number of inaccuracies in the information provided by Mr. Bostrom prior to the sale. For example, the 98 percent retention rate provided by Mr. Bostrom was not supported by the facts: over the two years prior to the purchase, MBA had lost 35 percent of its business. At trial, Mr. Bostrom admitted that when he responded to the question of whether MBA had lost any significant clients, he should have included a fourth group, Oftedal Construction Company, which had approximately 200 members enrolled on average, but that he failed to do so. He also admitted that MBA lost a number of other clients that he did not consider to be significant and therefore did not disclose to Dr. Haynes and Ms. Wasson. In fact, in 2008, MBA lost a total of 19 groups; and in 2009, it lost a total of 15 groups.[1]

[¶7] Ms. Wasson and Dr. Haynes also discovered that Mr. Bostrom had failed to disclose information relating to the Wyoming Associated Builders Insurance Trust (WABIT) group, MBA's largest client. The enrollment figures provided by Mr. Bostrom to Dr. Haynes and Ms. Wasson showed that WABIT had 780 enrolled members; after the

---

[1] Those groups represented up to 241 members.

2

purchase, they learned that WABIT's enrollment had steadily declined from July of 2009 through closing on the sale of MBA to 300-350 members, roughly half of what had been represented. In addition, in July of 2009, MBA advanced $84,241 to WABIT because WABIT did not have enough money to cover pending claims. MBA made a second advance to WABIT in November of 2009 in the amount of $73,000.[2] Also in November, Mr. Bostrom learned that WABIT had lost a lawsuit and its checking account was being garnished to pay attorney fees. Mr. Bostrom admitted that he did not disclose WABIT's declining enrollment, the money MBA had advanced to WABIT, or WABIT's legal and financial trouble to Dr. Haynes and Ms. Wasson.

[¶8] In August of 2009, MBA's net income was approximately $40,000 per month. Maverick purchased MBA in February of 2010. By the end of 2010, its net income was $5,000 per month. Maverick stopped making payments on the Promissory Note after August of 2011 and filed this lawsuit against Mr. Bostrom; Bostrom Enterprises, LLC; and Mountain States Review, Inc. (hereinafter collectively referred to as Mountain States), seeking damages but not rescission. Mountain States counterclaimed on the Promissory Note and brought a third-party complaint against Maverick, MBA, Dr. Haynes, and Ms. Wasson (hereinafter collectively referred to as Maverick) on the Personal Guaranty. Maverick asserted an affirmative defense that Mr. Bostrom was the first to breach the contract and Maverick is therefore excused from performing its contractual duties.

[¶9] At trial, after Maverick rested its case, Mountain States moved for judgment as a matter of law on all of the pending claims. The district court granted the motion, ruling that Maverick had not proven damages:

> I think the jury just would have no way of computing damages in this case for any of those claims so based on the lack of evidence from which the jury could with some certainty compute damages and the law is clear that a jury may not speculate or guess as to damages, those claims have to fail because of the fact that even if the jury were to find those breaches they would be unable to award any damages.

The district court also granted the motion with respect to Mountain States' claims on the Promissory Note and the Personal Guaranty and ruled that Maverick's first-to-breach affirmative defense could not be presented to the jury. The court entered judgment for the balance of the note, plus interest, in favor of Mountain States. Maverick timely filed this appeal, raising only the issue of its ability to assert its affirmative defense.

---

[2] Mr. Bostrom testified that the first advance in the amount of $84,241 had been paid back. There is nothing in the record indicating whether the second advance was ever repaid by WABIT.

## STANDARD OF REVIEW

[¶10] Judgment as a matter of law is permitted when "a party has been fully heard on an issue" and the "court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." W.R.C.P. 50(a)(1). We review district court decisions granting judgment as a matter of law de novo. *Witherspoon v. Teton Laser Ctr., LLC*, 2007 WY 3, ¶ 8, 149 P.3d 715, 723 (Wyo. 2007).

> Under our de novo standard, we undertake a full review of the record without giving deference to the trial court's views. *Wyoming Medical Center, Inc. v. Murray*, 2001 WY 63, ¶ 7, 27 P.3d 266, ¶ 7 (Wyo. 2001). The test is whether the evidence is such that, without the witnesses' credibility being weighed or the weight of the evidence otherwise being considered, there can be but one conclusion as to the verdict that reasonable persons could have reached. *Id.* We view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all the reasonable inferences which may be drawn from the evidence. *Id.* When the facts presented permit the drawing of more than one inference, it is for the jury to choose which will be used. *Id.* "If the inferences favorable to the movant are subject to doubt, or if parallel inferences can be drawn, the motion appropriately is denied." *Id.*

*Witherspoon*, 2007 WY 3, ¶ 8, 149 P.3d at 723 (citing *Worman v. Carver*, 2004 WY 38, ¶ 9, 87 P.3d 1246, 1249 (Wyo. 2004)).

## DISCUSSION

### I. May Maverick assert the first-to-breach affirmative defense on Mountain States' breach-of-contract counterclaim?

[¶11] The sole issue presented by Maverick for review is whether the district court erred in preventing it from asserting the first-to-breach affirmative defense. Maverick argues that the district court's finding that it did not prove damages on its original claims has no bearing upon the legal question of whether it can assert the first-to-breach affirmative defense against Mountain States' counterclaim, and that the district court erred when it concluded that the defense was unavailable. Mountain States contends that the assertion of the first-to-breach defense in this instance would mean that Maverick is both affirming the contract by continuing to operate MBA and disaffirming the contract by avoiding its duties thereunder, which the law does not permit.

4

[¶12]  The posture of this case limits this Court's options because Maverick seeks review only of its ability to assert the first-to-breach defense and not the question of whether it proved damages.[3]  It seems that both parties are asking for the same thing: to gain the benefit of the contract without having to fully satisfy their burdens.  Maverick seeks to continue the business of MBA, without having to pay the outstanding balance due on the note.  Mountain States claims that it is due the entire outstanding balance on the note despite the fact that, taking the facts in the light most favorable to Maverick as we are required to do on review of a Rule 50 judgment, the assets and clients delivered to Maverick were not what Mountain States contracted to sell.

[¶13]  In ruling that Maverick could not assert its first-to-breach affirmative defense, the district court reasoned the assertion of the defense would excuse Maverick from paying the balance due on the Promissory Note and that in effect would be awarding damages in the amount of the full price of the contract less what had already been paid.  However, because it had already ruled that Maverick had not proven damages, the district court could not allow Maverick to assert the first-to-breach defense and obtain damages in this "indirect or backdoor way."  This approach is erroneous.  Indeed, the parties have provided no authority and we have found none to support the notion that a party seeking to assert the first-to-breach defense must prove damages to maintain that defense.  However, we may affirm a district court's ruling on any basis appearing in the record, even if reasons articulated in the district court's ruling are incorrect.  *JLK v. MAB*, 2016 WY 73, ¶ 15, 375 P.3d 1108, 1112 (Wyo. 2016); *Redland v. Redland*, 2015 WY 31, ¶ 17, 346 P.3d 857, 866 (Wyo. 2015); *Armstrong v. Hrabal*, 2004 WY 39, ¶ 56, 87 P.3d 1226, 1244 (Wyo. 2004); *Walker v. Karpan*, 726 P.2d 82, 89 (Wyo. 1986).

[¶14] We begin our analysis with an examination of the first-to-breach affirmative defense.[4]  The rule provides that a party cannot claim the benefit of a contract that it was the first to materially breach.  *White v. Empire Express, Inc.*, 395 S.W.3d 696, 715-16

---

[3] In its brief, Maverick states that it "do[es] not challenge [the finding that it did not present sufficient evidence upon which a jury could determine damages] or the decision based on the finding."

[4] Rule 8(c) of the Wyoming Rules of Civil Procedure governs the assertion of affirmative defenses.  It states:

> *Affirmative defenses.* – In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppels, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting avoidance or affirmative defense.  When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

5

(Tenn. Ct. App. 2012); *Kinstler v. RTB South Greeley, Ltd. LLC*, 2007 WY 98, ¶ 7, 160 P.3d 1125, 1127 (Wyo. 2007) ("one party's material breach may excuse the other party's performance under that agreement").

[¶15]  The party asserting the affirmative defense bears the burden of proof.  To establish the first-to-breach affirmative defense, the party asserting the defense must show that the other party breached first and that the breach was material.  *The Ray Malloly Trust v. Juhl*, 2004 WL 1375542 *3 (Tex. Ct. App. 2004); *George K. Baum Properties, Inc. v. Columbian Nat'l Title Ins. Co.*, 763 S.W.2d 194, 203 (Mo. Ct. App. 1998); *see also Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 316 (Tex. Ct. App. 2011) (finding evidence sufficient to support verdict that plaintiff was first to breach).  Generally, the question of whether a party first breached is a question of fact to be determined by the factfinder.  *Clean Uniform Co. St. Louis v. Magic Touch Cleaning, Inc.*, 300 S.W.3d 602, 612 (Mo. Ct. App. 2009); 17A Am. Jur. 2d *Contracts* § 684 (2004).  For the purposes of this analysis, and because we examine the facts in the light most favorable to Maverick, we will assume that Mountain States breached the contract by failing to disclose the loss of certain members and accounts and that this breach was material.

[¶16]  However, even where there has been a prior material breach, courts have held that a party may lose its right to assert the first-to-breach rule if it accepts the benefits of the contract with knowledge of the breach.  *See White*, 395 S.W.3d at 716; *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 787 (7th Cir. 2015); *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009); *see also* Restatement (Second) of Contracts § 246 (1981, database updated 2016).  As one commentator has explained:

> When there has been a material failure of performance by one party to a contract, so that a condition precedent to the duty of the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform. ***In other words, the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply when the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.***

14 Samuel Williston, Treatise on the Law of Contracts § 43:15, at 677-78 (Richard A. Lord ed., 4th ed. 2013) (emphasis added); *see also* 17A Am. Jur. 2d, *Contracts* § 715

6

(2004) ("An election by a party to perform notwithstanding a breach, and thus waiving the breach, is conclusive in the sense of depriving that party of any excuse for ceasing performance, with the result that the party at fault may require that the other party perform."). Thus, when one party to a contract materially breaches the contract, the non-breaching party has two options: it may continue the contract -- retain its economic benefits and sue for damages, or it may repudiate the agreement -- suspend performance under the contract and sue for damages. Restatement (Second) of Contracts § 246, cmt. a-c, illus. 1-3. If the party elects to continue with the contract, it cannot later suspend performance and then claim that it had no duty to perform based upon the first material breach. That defense is waived when the party elects to continue performance of the contract.

[¶17] *Fryer v. Campbell*, 48 Wyo. 122, 43 P.2d 994 (1935) illustrates this principle. There, the parties entered into a contract for the sale of motion picture show equipment along with the lease of a building. *Id*., 43 P.2d at 994-95. The purchaser sued, claiming that he was induced to make the purchase by certain fraudulent representations made by the defendant/seller. *Id*. at 995. Upon discovering the false representations, the plaintiff continued to operate the business and use the property and then sued, demanding a rescission and the return of his money. *Id*. at 995-96. The defendant argued that if the plaintiff had the right of rescission at one point, he waived it by continuing to use the property. *Id*. at 996.

[¶18] Quoting *Shappirio v. Goldberg*, 192 U.S. 232, 242, 24 S.Ct. 259, 261, 48 L.Ed 419 (1904), we stated:

> That where a party desires to rescind upon the ground of misrepresentation or fraud, he must, upon the discovery of the fraud, announce his purpose and adhere to it. If he continues to treat the property as his own the right of rescission is gone, and the party will be held bound by the contract. In other words, when a party discovers that he has been deceived in a transaction of this character he may resort to an action at law to recover damages, or he may have the transaction set aside in which he has been wronged by the rescission of the contract.

*Fryer*, 43 P.2d at 997 (internal citation omitted). This Court then went on to explain that if the use of the property was "trivial in comparison with the sole subject-matter of the transaction," or "was proper in the care and preservation of the property," or "was during the reasonable time the buyer ha[d] to make his election" and "compensation for the change in conditions can be readily and accurately made," recovery for rescission will still be available. *Id*. (internal citations omitted).

7

[¶19]  In *Long v. Huffman*, 557 S.W.2d 911 (Mo. Ct. App. 1977), Long hired Huffman to work in his medical practice.  They entered into a two-year employment agreement giving Huffman an option to purchase a 50 percent interest in the clinic upon "approval of the employer," containing a covenant not to compete, and providing that the contract was not assignable.  *Id*. at 913.  Prior to the commencement of Huffman's employment, Long incorporated his practice.  Huffman took up employment with Long under the contract and worked until the completion of its two-year term.  *Id*.  During his second year of employment, Huffman told Long that he wished to exercise his option to purchase a 50 percent share in the clinic.  *Id*. at 914. They entered into negotiations but were never able to reach an agreement.  *Id*.  After the completion of his two-year term, Huffman left Long's clinic and opened a practice of his own.  *Id*.  Long sued, seeking an injunction restraining Huffman from violating the non-compete provision of the contract.  *Id*. Huffman contended that Long was the first to materially breach the employment contract and, as a result, Huffman did not have to abide by the non-compete provision.  *Id*. at 915. Huffman claimed that Long breached the contract when he incorporated the practice, which Huffman contended violated the prohibition against assignment, and when deductions were taken from income for the retirement plan.  *Id*.  The court concluded that Huffman waived the alleged breaches because he accepted pay from the corporation from his first day of employment and never objected, and because he knew about the retirement plan and acceded to it.  *Id*. at 915, 916.  "This conduct of acquiescence induced Long to continue to employ, pay and benefit Huffman . . . and now estops him to contradict earlier consent.  To deny enforcement of the [non-compete provision] would be to allow a party to benefit from a contract he disaffirms."  *Id*. at 915.

[¶20]  More recently, in *Edwards v. Allied Home Mortg. Capital Corp.*, 962 So.2d 194, 208 (Ala. 2007), the Alabama Supreme Court affirmed the trial court's judgment as a matter of law on Allied's breach-of-contract claim.  There, Edwards had been the branch manager of Allied's mortgage brokerage office in Huntsville from 1997 through 2003 when she was terminated.  *Id*. at 198, 201.  The terms of her employment were governed by the branch operating/employment agreement.  That agreement specified: "All monies received by [Edwards] for [Allied] . . . shall be made payable to [Allied] and received in trust by [Edwards] . . . and delivered immediately to [Allied].  [Edwards] shall open no bank accounts in [Allied's] name."  *Id*. at 199.  Among other things, Edwards began retaining checks that were payable to Allied and deposited those checks into an account she opened in the name of "Vicki W. Edwards D/B/A Allied Mortgage Capital Corporation."  *Id*. at 200.  After learning of the account, Allied sued Edwards seeking damages for violation of their agreement.  *Id*. at 201.  Edwards' defense to Allied's breach-of-contract claim was that Allied breached first (by underpaying her during the course of their relationship) and as a result could not enforce the agreement against her. *Id*. at 206.  The court rejected that defense, holding:

> Edwards continued the agreement and received its financial
> benefits for approximately four years after she learned of

Allied's purported nonperformance. Having made that election, Edwards was not excused from performing her own obligations under the agreement. *See Restatement* § 246. The evidence is undisputed that, following Allied's purported breach, Edwards did not send all closing checks to Allied, failed to hold Allied's funds "in trust," opened a bank account in Allied's name, and directly paid branch-operating expenses from her d/b/a/ account. Edwards'[] argument that Allied "breached first" did not excuse her nonperformance where, as here, she accepted the benefits of the agreement with knowledge of Allied's alleged breach.

*Id*. at 208.[5]

[¶21] Turning to the facts in the case before us, it is Maverick's conduct which is dispositive. There is no evidence in the record manifesting its intent to do anything other than continue with the contract. Ms. Wasson testified that they learned that they had been provided inaccurate information beginning with WABIT and that the extent of the inaccuracies "unfolded over 18 months." During that time, they continued to perform under the contract and to operate MBA. When Dr. Haynes was questioned about whether he confronted Mr. Bostrom after he first learned that WABIT was "bleeding numbers," he responded:

> A. [Dr. Haynes:] I wouldn't say, "confront." I'm sure we had a discussion, but not a confrontation. It's early on and it was clear to me, especially with [Ms. Wasson's] experience, that we needed [Mr. Bostrom] to do what we needed [Mr. Bostrom] to do, which is be a liason between us and the book of business and to keep a smooth transition in progress. Not any ripples.
>
> . . . .

---

[5] Edwards had also filed a breach of contract counterclaim against Allied. Allied argued that Edwards had waived its breach for the same reasons she could not assert the first-to-breach defense -- she continued to accept the benefits of the agreement after learning of Allied's purported breach. *Id*. at 208-09. The court disagreed, implicitly distinguishing between a waiver, an "intentional relinquishment of a known right," and the acceptance of benefits of a contract with knowledge of the other party's breach. *Id*. at 208. The court relied upon Edwards' testimony that during the term of the agreement "she orally complained on dozens of occasions to different representatives of Allied about its mismanagement of the branch account." *Id*. at 209. The court concluded that whether Edwards had waived Allied's breach was a factual question that must be addressed by a jury and that Allied was not entitled to a judgment as a matter of law on that question. *Id*.

9

Q. [H. Bailey:] All right. So you were trying to make the best of a bad situation?

A. You have to. Yes. You have to.

Q. Okay. Any other reason why you didn't confront Mr. Bostrom and say, "Hey," you know, "what's the deal?"

A. Well, I'm sure I mentioned it and we had a discussion about it, but nothing that comes to mind about the discussion. In other words, it wasn't heated. It was "What is going on with these guys?" Well, a myriad of problems. You know, obviously, I could have asked "Well, why didn't you tell us that?" Well, it's a little late for that. We have to make this work now.

Ms. Wasson testified in the same vein. There came a time when Dr. Haynes and Ms. Wasson discovered that Mr. Bostrom had taken $85,000 without permission. Ms. Wasson was questioned about this:

Q. [Mr. Miller:] And you didn't demand it back?

A. [Ms. Wasson:] We asked him about it at that time and then he got his attorney involved and we wrote letters and [Dr. Haynes] and I discussed how to handle it and decided we needed [Mr. Bostrom] to help us with the business at that point. We didn't want to rock the boat. We knew at some point down the road we could address it and get repayment.

. . . .

We wanted [Mr. Bostrom] to stay and pave our way with the existing client base, introduce us, make it a smooth transition. So no, we weren't willing to go to battle over that at that point.

Q. Okay. You waited for a year and a half; right?

A. Yes. We waited until we were at the end of the rope.

[¶22] Taking all of the evidence in the light most favorable to Maverick and giving Maverick the benefit of all the reasonable inferences which may be drawn from the evidence, we cannot conclude that it demonstrated any intent other than continuing with

10

the contract once it knew about Mountain States' breach. In fact, it continued to perform its obligations under the contract from February 2010 through August of 2011. Having made the election to continue after learning of Mountain States' alleged misrepresentations, it was not excused from performing its own obligations under the agreement.[6]

[¶23] Although in some circumstances the acceptance of contractual benefits will not constitute a waiver of the first material breach bar to recovery, they are not present here. *See Fryer*, 43 P.2d at 997. For example, "efforts on the part of an innocent party to persuade the promisor, who repudiates his agreement, to reject the repudiation and proceed honorably" that are ultimately unsuccessful have been held not to be a waiver of a first-to-breach defense. *White*, 395 S.W.3d at 716 (citations omitted). Further, where a party to a contract fails to assert the other party's breach because they are fraudulently induced to continue with the contract, that party will not be prevented from asserting that the other party was the first to breach. *Id.*; *see also Madden Phillips Constr.*, 315 S.W.3d at 816.

[¶24] There is no evidence in the record that would indicate Maverick's continuance with the contract was a "temporary decision to withhold termination" of the contract or that it was fraudulently induced to continue with the contract. The evidence is undisputed that Maverick continued to operate the business for 18 months; the testimony of Dr. Haynes and Ms. Wasson illustrates that their intent was to continue operating the business, even as they discovered Mr. Bostrom's misrepresentations; and there is no evidence that Dr. Haynes or Ms. Wasson indicated to Mountain States that they had any intent other than to continue to operate the business. Thus, Maverick's acceptance of contractual benefits after learning of Mountain States' alleged breach prevents it from asserting a prior breach as a defense to Mountain States' breach-of-contract claim.

## II. *Does Mountain States have a contractual right to attorney fees on appeal?*

[¶25] Mountain States takes the position that it has a contractual right to reasonable costs and attorney fees on appeal based upon language contained in the Promissory Note and Personal Guaranty.

[¶26] We have held that "[a] party is entitled to recover attorney fees if expressly provided by statute or contract. 'Where a contract allows the award of attorney's fees, that includes fees incurred on appeal.'" *Lokey v. Irwin*, 2016 WY 50, ¶ 15, 374 P.3d 311, 316 (Wyo. 2016) (quoting *Kinstler*, 2007 WY 98, ¶ 13, 160 P.3d at 1129).

---

[6] This election however did not prohibit Maverick from seeking damages on Mountain States' breach. "[I]f the aggrieved party elects to continue the contract, the obligations of both parties remain in force and the injured party retains only a claim for damages for partial breach." 17A Am. Jur. 2d § 705 (2004).

11

[¶27] Here, the Promissory Note provides:

> Attorneys' Fees. Maker [Maverick] hereby agrees to pay reasonable attorneys' fees and all other reasonable costs and expenses incurred, after an Event of Default, in the enforcement of this Note, the enforcement of any security interest with respect to this Note, and the collection of amounts due hereunder, whether such enforcement or condition is by court action or otherwise.

The Promissory Note includes "[m]aker's failure to pay when due any part of the principal or interest under this Note within 10 days after such amount is due" as an "Event of Default." Further, the Personal Guaranty executed by Dr. Haynes and Ms. Wasson provides that they "absolutely, irrevocably and unconditionally gurarantee[] to the Lender payment and the full, faithful and timely performance of any and all liabilities and obligations of Borrower whether now existing or hereafter incurred under the Note."

[¶28] Mountain States is entitled by the terms of the Promissory Note and Personal Guaranty to recover reasonable attorney fees incurred on appeal. Pursuant to W.R.A.P. 10.06, we will determine the appropriate sum to be awarded after counsel submits proper documentation. *See Lokey*, 2016 WY 50, ¶ 15, 374 P.3d at 316.

## *CONCLUSION*

[¶29] Maverick's continued performance of the contract after learning of Mountain States' alleged breach prevents it from asserting a prior breach as a defense to Mountain States' breach-of-contract claim. Mountain States is entitled to attorney fees on appeal. Affirmed.